PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

v.

TIMOTHY DEQUASIE,
            *Defendant-Appellee.*

No. 03-4280

Appeal from the United States District Court
for the Southern District of West Virginia, at Beckley.
Robert C. Chambers, District Judge.
(CR-02-228)

Argued: December 4, 2003

Decided: July 1, 2004

Before WILLIAMS, MOTZ, and SHEDD, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Shedd wrote the
majority opinion, in which Judge Williams joined. Judge Motz wrote
a dissenting opinion.

---

## COUNSEL

**ARGUED:** Joshua Clarke Hanks, Assistant United States Attorney,
Charleston, West Virginia, for Appellant. Silas Mason Preston,
PRESTON & WEESE, L.C., Lewisburg, West Virginia, for Appellee.
**ON BRIEF:** Kasey Warner, United States Attorney, Charleston,
West Virginia, for Appellant.

**OPINION**

SHEDD, Circuit Judge:

During the late evening and early morning hours of March 18-19, 2002, law enforcement officers executed two search warrants at the Summerlee, West Virginia, residence of Timothy DeQuasie. The purpose of the first search was to attempt to locate two women, one of whom was reportedly missing and being held against her will by DeQuasie in the residence. While law enforcement officers were executing the first search warrant, they observed evidence of apparent drug activity at DeQuasie's residence, and they therefore obtained a second warrant to search the residence for drugs and drug-related materials. During the second search the officers seized (among other things) a firearm and ammunition.

A federal grand jury subsequently indicted DeQuasie under 18 U.S.C. §§ 922(g)(3) and (g)(9) for illegal firearm possession by an unlawful user of a controlled substance and by a person who has been convicted of a misdemeanor crime of domestic violence. Before trial, DeQuasie moved to suppress the firearm and ammunition on the ground that those items were seized from his residence in violation of the Fourth Amendment. The district court agreed and granted the suppression motion, *United States v. DeQuasie*, 244 F. Supp. 2d 651 (S.D.W. Va. 2003), and the United States now appeals. Because we find that the good-faith exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897 (1984), makes the evidence admissible, we reverse the suppression order and remand for further proceedings.

I

At approximately 5:30 p.m. on March 18, 2002, Shawn Bandy ("Shawn") telephoned Detective-Corporal J.L. Brown of the Fayette County, West Virginia, Sheriff's Office and reported that his wife, Lora Bandy ("Lora"), had been missing for several days.[1] Shawn fur-

---

[1]Although Ms. Bandy's name appears in the record as "Lora" and "Laura," the district court referred to her as "Lora," and we will likewise.

ther reported that he had been told by his sister-in-law, Tiffany Mason ("Tiffany"), that Lora was being held against her will at DeQuasie's residence, that when Lora would attempt to leave the residence DeQuasie would give her crack cocaine, and that the effect of the crack cocaine was to "induce a stupor from which [Lora] was unable to stay in her right mind." (J.A. 16).

Detective-Corporal Brown relayed this information to his supervisor, Detective-Corporal J.K. Sizemore. Deputy M.A. Webb was then sent to meet with Shawn and complete a missing person report. Deputy Webb met with, and obtained statements from, Shawn and Shawn's mother-in-law, Cynthia Mason ("Cynthia"), and he completed a missing person report. Shawn and Cynthia told Deputy Webb that Lora and Tiffany had willingly gone to DeQuasie's residence, but DeQuasie was then holding Lora there against her will by using drugs to keep her in a stupor, the effect of which was to prevent her from leaving the residence. Shawn and Cynthia also told Deputy Webb that DeQuasie had threatened to kill any family members who attempted to get Lora from the residence and that Tiffany had seen a large quantity of drugs and weapons, as well as several scanners, inside the residence.

Other than the fact that Lora was missing, it appears that all of the information that Shawn and Cynthia reported was based on what Tiffany had told them. Although it is not apparent from the record, the district court assumed that Tiffany told them this information over the telephone, *see* 244 F. Supp. 2d at 652, and the parties do not contend otherwise. The officers did not speak with Tiffany.[2]

Sometime during the evening Detective-Corporal Brown drove to DeQuasie's residence to obtain a description of the residence for purposes of a search warrant. While there, Detective-Corporal Brown observed several unidentified people inside the residence, but he did not approach the residence.

---

[2]The district court stated that "[n]o attempt was made to interview Tiffany . . . prior to Detective-Corporal Sizemore's application for a search warrant," 244 F. Supp. 2d at 653; however, the record actually appears to be silent as to whether such an attempt was made.

Based on this information, Detective-Corporal Sizemore applied to a magistrate for a warrant to search DeQuasie's residence for Lora and Tiffany.[3] In his sworn affidavit and application for the warrant, Detective-Corporal Sizemore detailed (among other things) his experience and training in law enforcement, the information reported to Detective-Corporal Brown and Deputy Webb by Shawn and Cynthia, and Detective-Corporal Brown's observation of DeQuasie's residence. Detective-Corporal Sizemore stated that he believed that Lora and Tiffany were present at DeQuasie's residence, that Lora (but not Tiffany) was being held there against her will, and that "[g]iven the severity of this situation it appears likely that [Lora's] life may be in jeopardy if she continues to stay at this residence." (J.A. 16-17). Although Detective-Corporal Sizemore had information about drugs being present and used in DeQuasie's residence, he did not seek a warrant to search for drug-related evidence.[4]

The magistrate issued a warrant for the purpose of searching DeQuasie's residence for Lora and Tiffany. At 10:30 p.m., Detective-Corporal Sizemore and a team of law enforcement officers executed the search warrant and found Lora and Tiffany, who were unharmed, at DeQuasie's residence.[5] During this search, Detective-Corporal Sizemore smelled the "strong odor of marijuana coming from inside" the residence, and he observed "at the door" of the residence "a small quantity of green vegetation which appeared to be marijuana." (J.A. 22). In addition, other officers who had patted down DeQuasie discovered two cell phones on him. Based on his observations and the

---

[3]Detective-Corporal Sizemore's reason for listing Tiffany as a subject of the warrant does not appear in the record.

[4]Detective-Corporal Sizemore also stated in his affidavit that DeQuasie is "associated with Giuseppe Wallace," who the United States asserts in its appellate brief was recently convicted in the Southern District of West Virginia on charges of drug trafficking. The significance of this purported association is not readily apparent in the affidavit.

[5]It is not clear from the record whether Lora was found inside or outside the residence, and the parties' positions differ on this point. *Compare* J.A. 37 (United States' assertion that officers "found Ms. Bandy in defendant's residence") with J.A. 64 (DeQuasie's assertion that Lora met officers outside the residence). The record is silent on where Tiffany was found.

discovery of the two cell phones (which he associated with possible drug activity), Detective-Corporal Sizemore left officers at DeQuasie's residence and returned to the magistrate's office and applied for a second warrant to search the residence for evidence of illegal drug activity.

In his sworn affidavit and application for this warrant, Detective-Corporal Sizemore detailed (among other things) his law enforcement experience and training (including his training and knowledge of illegal drug activities) and his observations of apparent illegal drug activity during the execution of the first search warrant. Detective-Corporal Sizemore also referred to statements made by Shawn and Cynthia to Deputy Webb that Tiffany had told them that "DeQuasie had approximately $20,000.00 in cash at his residence as well as a large quantity of drugs including crack cocaine earlier in the day." (J.A. 22). Detective-Corporal Sizemore noted that while this information could not be "judged as to reliability," it, combined with his observations at DeQuasie's residence, tended to confirm that DeQuasie probably had in his possession a controlled substance. (J.A. 22).

The magistrate issued the second warrant for the purpose of searching DeQuasie's residence for controlled substances, materials used to facilitate the use and sale of controlled substances, records pertaining to the sale of controlled substances, cash and financial information, and weapons. At 12:05 a.m., Detective-Corporal Sizemore executed the second warrant. At the beginning of this search, DeQuasie was advised of his *Miranda* rights, and he agreed to answer questions. DeQuasie stated that although he did smoke marijuana, he did not use cocaine and he did not have any controlled substances in his residence at that time. DeQuasie also stated that he had previously been convicted of domestic battery and that he kept a revolver concealed under his living room couch. DeQuasie denied having any knowledge of, or participation in, sales of controlled substances.

The search of DeQuasie's residence yielded a loaded Smith and Wesson .32 Long revolver, which was found under the cushion of the living room couch; ammunition for this revolver; a battery-operated Pointscale; a stem for a crack pipe; a roach-clip; a plastic bag containing white powder residue; a section of copper scrub pad (commonly used to make screens for crack pipes); a package of E-Z Wider rolling

papers; a cell phone bill in DeQuasie's name; two cell phones; and $699 cash, which was concealed under a dresser drawer in DeQuasie's bedroom. After completing the search, Detective-Corporal Sizemore arrested DeQuasie and charged him with being a prohibited person in possession of a firearm and with possession of a controlled substance. A federal grand jury subsequently indicted DeQuasie for illegal possession of the revolver.

Before trial, DeQuasie moved to suppress the revolver and the accompanying ammunition. DeQuasie argued that the magistrate issued the first search warrant without sufficient probable cause because the officers did not speak with Tiffany or independently verify statements that Shawn and Cynthia attributed to her; and because the first search warrant was invalid, the evidence seized during the second search is "fruit of the poisonous tree" and must be suppressed. DeQuasie also argued that the evidence is not admissible under the good-faith exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897 (1984), which provides that suppression of evidence seized pursuant to an invalid search warrant is not appropriate if the law enforcement officer executing the warrant acted in objectively reasonable good-faith reliance that the warrant as issued by the judicial officer was valid. The United States argued in response that the first warrant was supported by probable cause, the second warrant was therefore properly issued, and consequently, all evidence was properly seized and admissible. Following oral argument on the motion, the parties (at the district court's direction) briefed the potential applicability of the *Leon* good-faith exception.

The district court granted the suppression motion and ordered that all evidence seized during the first and second searches must be excluded. Considering first the *Leon* good-faith exception, the district court concluded that the affidavit for the first warrant is a "bare bones" affidavit and that a "number of inconsistencies" indicate the absence of objectively reasonable law enforcement activity; consequently, the district court held that under our decision in *United States v. Wilhelm*, 80 F.3d 116 (4th Cir. 1996), the *Leon* exception does not apply. 244 F. Supp. 2d at 655-58. The district court then concluded that because of the "bare bones" nature of the affidavit for the first warrant, that warrant was issued without probable cause; after noting that the United States did not argue an independent source for the sec-

ond warrant, the district court further concluded that the invalidity of the first warrant compelled exclusion of the fruits of the second warrant. *Id.* at 658-59.

Pursuant to 18 U.S.C. § 3731, the United States has appealed the district court's order. The United States argues that the district court erred with respect to both its probable cause and *Leon* rulings.

## II

Before addressing the merits of the appeal, we must address a procedural problem created by the United States: that is, its failure to certify to the district court in a timely manner "that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." 18 U.S.C. § 3731.[6] Section 3731 permits the United States to file an interlocutory appeal from an adverse suppression ruling (before a defendant has been put in jeopardy and before the verdict or finding on an indictment or information) only if it makes that certification to the district court. The certification requirement of § 3731 operates to ensure that before the United States interrupts a criminal proceeding (and thereby delays a defendant from obtaining resolution of the charges against him) by taking an interlocutory appeal, it has evaluated whether the appeal is warranted, *see United States v. Smith*, 263 F.3d 571, 577 (6th Cir. 2001) ("The certification is intended to ensure a 'conscientious pre-appeal analysis by the responsible prosecuting official'" (citation omitted)); *United States v. Herman*, 544 F.2d 791, 794 (5th Cir. 1977) ("The requirement is not a mere formality; its purpose is to protect the accused from undue delay"); the certificate itself operates as proof of the evaluation. *See United States v. Juvenile Male No. 1*, 86 F.3d 1314, 1326 (4th Cir. 1996) (Wilkinson, J., concurring) (§ 3731 certifi-

---

[6]Although § 3731 does not specify a time limit for the certificate to be filed, *see United States v. Bookhardt*, 277 F.3d 558, 562 (D.C. Cir. 2002) ("the statute does not mention a filing deadline for certification at all"), we have previously assumed that it must be filed within the thirty-day period in which the United States is permitted to notice an appeal under this statute. *See In re Grand Jury Subpoena*, 175 F.3d 332, 337 (4th Cir. 1999).

cation is an "executive determination" that has been "deemed outside the scope of judicial review").

This is an issue that was not raised by DeQuasie, and it only became apparent to us after oral argument. At that time, the United States had not filed the § 3731 certificate. Because we were aware that another panel of the Court was in the process of addressing the same issue in *United States v. Hatfield*, No. 03-4403 (4th Cir.), a case which involves the same United States Attorney's Office that is pursuing this appeal, we held this case in abeyance until an opinion was issued by that panel. Following entry of the *Hatfield* opinion, *see* 365 F.3d 332 (4th Cir. 2004), we directed the parties to file supplemental briefs addressing this issue. In response, the parties have filed their supplemental briefs, and the United States has filed a § 3731 certificate in the district court.

## A.

In *Hatfield*, the United States filed a timely appeal from an adverse suppression ruling, but it did not file the § 3731 certificate until one week before oral argument, and several months after the appellee had moved to dismiss the appeal. The United States explained during oral argument that its failure to file the certificate initially was a "regretful oversight." 365 F.3d at 337. The appellee contended that the United States' failure to file the certificate had prejudiced him because he was under pretrial release restrictions and because he had to live with the burden of the impending trial. *Id.*

The *Hatfield* panel reaffirmed the settled principle that the certification requirement of § 3731 is not jurisdictional, and it noted that "[i]n the case of a delayed filing, the appellate court may, within its discretion, hear the case despite the irregularity in the perfection of the appeal." 365 F.3d at 337.[7] The panel then noted that in "weighing

---

[7]The *Hatfield* panel pointed to Rule 3(a)(2) of the Federal Rules of Appellate Procedure, which reads: "An appellant's failure to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but it is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal." 365 F.3d at 337.

the equities" appellate courts have utilized several factors to determine whether an appeal should be permitted to proceed despite the § 3731 irregularity: (1) the date the certificate was filed, (2) the reason for the lateness in filing the certificate, (3) whether the United States engaged in a conscientious pre-appeal analysis, (4) whether the United States acknowledges the importance of the certification requirement, (5) any prejudice to the defendant, (6) whether the appeal concerns issues that require appellate clarification, and (7) whether the appeal should be heard in the interests of justice. 365 F.3d at 337-38.

The panel then applied these factors to the facts of the case:

> Analyzing these factors, although all do not favor the government, we believe the equities of the case favor the United States. It is not disputed that the government did undertake the required process to obtain permission from the Solicitor General to pursue this appeal. The attorney for the government also candidly admitted the oversight which led to the delay in filing the certification. More importantly, the issue raised on appeal is a novel legal issue and one which will further delineate the boundaries imposed by the Fourth Amendment on searches and seizures. Also weighing heavily in favor of entertaining the government's appeal is the fact that, unlike other circuits, before today we had not yet fully explicated the importance of the certification requirement, and the grave consequences resulting from the government's failure to timely file. And finally, whatever prejudice the defendant suffered from pre-trial release, it was not substantial enough to outweigh these other factors.

*Id*. at 338. In light of the foregoing, the panel denied the motion to dismiss the appeal, but it also took the opportunity "to emphasize the importance of the certification requirement and to serve notice on the government that future failures to timely file will not be taken lightly." *Id*.

### B.

We have carefully considered the parties' supplemental briefs and have weighed the equities of the case, and we now conclude that it is "appropriate" under Fed. R. App. 3(a)(2) to allow this appeal to continue despite the procedural irregularity. We note particularly that DeQuasie does not claim any prejudice resulting directly from the United States' failure to certify. *See In re Grand Jury Subpoena*, 175 F.3d at 337 ("in weighing the equities in this case, we find it dispositive that appellee suffered no prejudice from any delay by appellant in obtaining a timely certification"); *see also Smith*, 263 F.3d at 578 ("Courts are not likely to dismiss an appeal unless the defendant is able to show 'actual substantial prejudice'" (citation omitted)). Moreover, we find that the United States did, in fact, undertake a considered evaluation of whether it should appeal the district court's order before filing this appeal.[8] Additionally, (as in *Hatfield*) this United States Attorney's Office has acknowledged its error and, more importantly, appears now to appreciate the importance of the certification requirement.[9] Finally, because of the importance of the issues addressed by the district court and the fact that the district court published its order, the interests of justice and the need for appellate clarification weigh in favor of us deciding this appeal.[10]

To be sure, we do not condone the United States' tardiness in com-

---

[8]The United States has explained in its supplemental brief that before this appeal was filed, the case was evaluated by the local United States Attorney's Office, the Criminal Division of the Department of Justice, and the Office of the Solicitor General. We note that in a motion to continue the trial filed by the United States in the district court five days after the district court's suppression order, the United States represented that it "need[ed] additional time wherein to consider filing an appeal of the Court's ruling on defendant's Motion to Suppress Evidence."

[9]In what appears to be the only interlocutory appeal filed by this United States Attorney's Office since this issue was raised in *Hatfield*, the § 3731 certificate appears to have been properly filed. *See United States v. Perez*, No. 04-4091 (4th Cir.) (certificate filed in the district court with the notice of appeal).

[10]DeQuasie concedes that the district court's suppression order is "fatal" to the United States' case against him.

plying with § 3731, and we are particularly troubled by the United States' failure to file the certificate promptly after the issue was raised in *Hatfield*. We are also mindful of the *Hatfield* panel's admonition that "future failures to timely file will not be taken lightly." 365 F.3d at 338. However, because this case and *Hatfield* overlapped time-wise (the *Hatfield* notice of appeal was actually filed eight weeks after the notice of appeal was filed in this case), we do not believe that our decision to allow this appeal to proceed is inconsistent with *Hatfield*.[11]

Having thus decided this preliminary matter, we now proceed to address the merits of this appeal.

III

The Fourth Amendment guarantees "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures." Under the Fourth Amendment, "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant," and "[i]n cases in which the Fourth Amendment requires that a warrant to search be obtained, 'probable cause' is the standard by which a particular decision to search is tested against the constitutional mandate of reasonableness." *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 528-29, 534 (1967).[12]

Probable cause is "a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S.

---

[11]Section 3731 requires the certificate to be filed in the district court. At least two circuits appear to require that the United States must include the certificate in the appellate record. *See United States v. Becker*, 929 F.2d 442, 445 (9th Cir. 1991); *Herman*, 544 F.2d at 794. While we decline to specify an absolute rule, we believe the better practice is for the United States to include the certificate in both the appellate record and the joint appendix, and also to reference it in its opening brief.

[12]The Supreme Court has cautioned that questions of reasonableness under the Fourth Amendment must be decided on the facts and circumstances of each case, and that seldom will one determination be a useful precedent for another. *Ornelas*, 517 U.S. at 696, 698.

213, 232 (1983). It "depends on the totality of the circumstances," *Maryland v. Pringle*, 124 S. Ct. 795, 800 (2003), and exists (in the context of a search) "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). The probable cause standard does not "require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information. . . ." *Taylor v. Farmer*, 13 F.3d 117, 121 (4th Cir. 1993).

It is well settled that probable cause may be founded upon hearsay and information received from informants. *Franks v. Delaware*, 438 U.S. 154, 165 (1978). However, there is no bright-line rule as to when such information may establish probable cause: "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation." *Adams v. Williams*, 407 U.S. 143, 147 (1972); *see also Gates*, 462 U.S. at 232 ("Informants' tips doubtless come in many shapes and sizes from many different types of persons. . . . Rigid legal rules are ill-suited to an area of such diversity").[13] Generally, when an effort is made to establish probable cause for the issuance of a search warrant based on hearsay from an informant, "it is necessary to consider all the circumstances set forth in the affidavit, including the veracity and basis of knowledge of persons supplying hearsay information. The degree to which an informant's story is corroborated may also be an important factor." *United States v. Hodge*, 354 F.3d 305, 309 (4th Cir. 2004) (citation and internal punctuation omitted). However, "[t]here is no set requirement that all tips be corroborated by subsequent police investigation in order to be considered credible. Whether subsequent corroboration is necessary must be determined in the light of the totality of the circumstances presented by the particular set of facts." *United States v. Blount*, 123 F.3d 831, 836 (5th Cir. 1997) (en banc).

---

[13]*Adams* (as well as some other cases we cite) involves a question of reasonable suspicion rather than probable cause. We do not suggest that the reasonable suspicion standard is applicable in this case.

Although "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands," *Leon*, 468 U.S. at 906, the Supreme Court adopted the exclusionary rule "to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347 (1974). Generally, the exclusionary rule provides that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure," *id.*, and it "reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations omitted).

In *Leon*, the Supreme Court established the good-faith exception to the exclusionary rule. Finding that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," 468 U.S. at 918, the Court held that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922. The Court observed that although searches authorized by a warrant "will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search . . . it is clear that in some circumstances the officer will have no reasonable grounds for believing the warrant was properly issued." *Id.* at 922-23 (citations and internal punctuation omitted).

The Court identified four circumstances in which the good-faith exception would not apply: (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) if "the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979)";[14] (3) if the affidavit supporting

---

[14]In *Lo-Ji Sales*, a judge accompanied law enforcement officers to an adult bookstore, inspected materials inside the bookstore, determined

the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) if under the circumstances of the case the warrant is "so facially deficient — *i.e.*, in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923 (internal punctuation omitted).

IV

Although the evidence that is the primary subject of the suppression motion — the revolver and ammunition — was seized during the second search pursuant to the second warrant, the pertinent inquiry for us involves the first warrant. This is so for two reasons. First, DeQuasie's only argument, and the district court's only basis, for suppressing this evidence is that the invalidity of the first warrant tainted the second warrant. Second, the United States has not properly argued that the evidence supporting issuance of the second warrant has a source that is independent of the first search.[15] Therefore, in this posture, if the first warrant is not supported by probable cause, then the evidence seized during the second search must be excluded unless the *Leon* exception to the exclusionary rule renders this evidence admissible.

---

whether each inspected item was obscene, and authorized seizure of items deemed obscene. The Supreme Court invalidated the search, finding that the judge "did not manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application for a search and seizure" because he "allowed himself to become a member, if not the leader, of the search party which was essentially a police operation." 442 U.S. at 326-27.

[15]At oral argument, counsel for the United States (in response to questioning) asserted for the first time that the second warrant may be independently valid because the officers executing the first warrant may have observed the suspected drug activity (*i.e.*, the odor of marijuana and the green vegetation) from outside the residence. While there is some evidence in the record that arguably supports this assertion, because of the United States' failure to raise this argument below, and the absence of a factual finding by the district court, we decline to consider it. *See United States v. Moss*, 963 F.2d 673, 675-76 (4th Cir. 1992) (declining to consider newly raised "fact-intensive" Fourth Amendment theory).

Without deciding whether the first warrant is supported by probable cause, we will exercise our discretion and proceed directly to consideration of the *Leon* exception. *See Leon*, 468 U.S. at 924-25 ("courts have considerable discretion in conforming their decision-making processes to the exigencies of particular cases"). "This is a less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place." *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002). Because there are no facts in dispute, the applicability of the *Leon* exception in this case is purely a legal conclusion, and we review the district court's ruling de novo. *United States v. Smith*, 30 F.3d 568, 571 (4th Cir. 1994) ("This Court reviews legal conclusions related to search and seizure issues de novo"). In making this determination, we consider all of the circumstances of the case. *Leon*, 468 U.S. at 922 n.23.

There is no evidence in the record to suggest that Detective-Corporal Sizemore "misled" the magistrate by knowingly or recklessly presenting false information, or that the magistrate "wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales*." Moreover, there is no claim that the first warrant was "so facially deficient" that the executing officers could not have reasonably presumed it to be valid. Therefore, the dispositive question is whether (as the district court found), under all the circumstances, the first affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." We believe that it is not.

### A.

The district court grounded its *Leon* analysis on our decision in *Wilhelm*. In that case, a law enforcement officer obtained a search warrant after an anonymous telephone caller reported having seen marijuana being sold in the defendant's house within the previous 48 hours. Despite the fact that the officer did not know the caller's identity and did not meet the caller before or after receiving the call, she stated in her affidavit in support of the warrant that the caller was a "concerned citizen" and a "mature person with personal connections with the suspects" who "projected a truthfull [sic] demeanor." The officer's only corroborating information was that she had confirmed directions to the defendant's house and that the caller's description of

the marijuana transactions was consistent with her own knowledge of marijuana transactions. *Wilhelm*, 80 F.3d at 117-18.

After finding that the search warrant was issued without probable cause, we concluded "that the good-faith exception to the exclusionary rule should not apply . . . due to the 'bare bones' nature of the affidavit, and because the state magistrate could not have acted as other than a 'rubber stamp' in approving such an affidavit." *Id.* at 121. In doing so, we defined a "bare bones" affidavit as "one that contains 'wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause.'" *Id.* (*quoting United States v. Laury*, 985 F.2d 1293, 1311 n.23 (5th Cir. 1993)). *Accord United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000) ("a 'bare bones' affidavit is similar to, if not the same as, a conclusory affidavit. It is one which states only the affiant's belief that probable cause existed") (citation and internal punctuation omitted).[16]

We explained that the case was "not a case of 'objectively reasonable law enforcement activity.'" 80 F.3d at 123. We stated that the officer "could not reasonably rely on an unknown, unavailable informant without significant corroboration," and "[b]ecause [the officer] presented to the magistrate nothing more than this unreasonable reliance, the Supreme Court's third exception to *Leon* applies: the affidavit . . . did not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'" 80 F.3d at 123.[17] We

---

[16]In *Gates*, the Supreme Court noted that a warrant affidavit "must provide the magistrate with a substantial basis for determining the existence of probable cause" and must not be "a mere conclusory statement that gives the magistrate virtually no basis at all for making [such] a judgment." 462 U.S. at 239. The Court then provided two examples of cases in which it had been presented with "bare bones" affidavits: *Nathanson v. United States*, 290 U.S. 41 (1933) (rejecting warrant based on "a mere affirmation of suspicion and belief without any statement of adequate supporting facts"), and *Aguilar v. Texas*, 378 U.S. 108 (1964) (rejecting warrant where magistrate "necessarily accepted 'without question' the informant's 'suspicion,' 'belief' or 'mere conclusion'"). *Gates*, 462 U.S. at 239.

[17]We have since recognized that *Wilhelm's* "substantial basis" standard is improper: "'Substantial basis' provides the measure for determination

noted in addition that "[w]hile perhaps not undertaken with deliberate bad faith, [the officer's] use of phrases such as 'concerned citizen,' 'mature' and 'truthful demeanor' strike this court as attempts to endue the affidavit with the appearance of genuine substance; this tactic suggests that [the officer] herself knew that probable cause was lacking, and thus that reliance on the resulting warrant was not reasonable." *Id.*[18]

The district court described this case as being "nearly identical to the circumstances present in *Wilhelm*" because "the only information included in Detective-Corporal Sizemore's affidavit as to Lora's alleged kidnaping, and Mr. DeQuasie's alleged drug activities, came from Tiffany," who was unknown to the officers involved and who had never provided them with information. 244 F. Supp. 2d at 656. The district court stated that neither the officers nor the magistrate "had any basis to justify reliance on the statements attributed to Tiffany" and that although "corroboration of the information [reported to the officers] may have been sufficient to save the validity of the search," the first affidavit "sorely lacks adequate corroboration of probable cause." *Id.* at 657. In an apparent analogy to our finding of "bad faith" on the officer's part in *Wilhelm*, the district court also identified "a number of inconsistencies in Detective-Corporal Sizemore's statements that indicate the absence of an 'objectively reasonable law enforcement activity.'" 244 F. Supp. 2d at 657 (*quoting Wilhelm*, 80 F.3d at 116).

---

of whether probable cause exists in the first instance. If a lack of substantial basis also prevented application of the *Leon* objective good faith exception, the exception would be devoid of substance." *Bynum*, 293 F.3d at 195 (citation omitted). Notably, the district court in *Bynum* cited *Wilhelm* for the "substantial basis" proposition. *See* 125 F. Supp. 2d 772, 797 (E.D. Va. 2000); *see also United States v. Danhauer*, 229 F.3d 1002, 1007 n.1 (10th Cir. 2000) ("While one of our sister circuits applies this language in its good-faith analysis, *see United States v. Wilhelm*, . . . this court utilizes the 'substantial basis' language solely in the probable cause context").

[18]We stated that "[t]he conclusion that an informant is reliable and mature based only on brief telephone conversations is dubious" and that the affidavit did not "disclose any basis for [the officer's] conclusion that her tipster was a 'concerned citizen.'" 80 F.3d at 121.

As we explain more fully below, the district court's reliance on *Wilhelm* is misplaced for two reasons.[19] First, this case does not involve a "bare bones" affidavit. Second, there is no evidence in this case of the type of "bad faith" conduct we addressed in *Wilhelm*. We address both of these points in order.

### B.

The warrant at issue in *Wilhelm* was supported only by an affidavit that "depended on information from an unnamed informant, and provided no indication of that informant's truthfulness or reliability." 80 F.3d at 120. In contrast, Detective-Corporal Sizemore's affidavit in support of the first warrant is markedly different as it is not based on information from "an unnamed informant," and it does not completely lack an indication of the informants' "truthfulness or reliability." Instead, Detective-Corporal Sizemore specifically identified in his affidavit the sources of the information provided to law enforcement (Shawn and Cynthia), he indicated that Deputy Webb had met with them face-to-face and completed a missing person report, and he acknowledged that they had received much (but not all) of their information from Tiffany. Although the officers did not independently corroborate the information reported by Shawn and Cynthia (to whatever extent it could have been corroborated), the nature and circumstances of the report itself provide several indicia of reliability that were absent in the *Wilhelm* affidavit.[20]

---

[19]Unlike *Wilhelm*, which involved a search of a residence for evidence of a drug crime, Detective-Corporal Sizemore obtained the first warrant for the purpose of searching for a missing person. While probable cause is a necessary predicate to the first search, we believe that the officers' conduct must be evaluated in the proper context. *See State v. Diloreto*, 829 A.2d 1123, 1135 (N.J. Super. Ct. App. Div.), *certification denied*, 837 A.2d 1094 (N.J. 2003) ("The need to investigate a missing person's report does not flow from the concern about criminal wrongdoing or involve the search for evidence of a crime, and the police conduct must be evaluated in that context").

[20]Other than speaking with Tiffany, there was not much the officers could have done to attempt to corroborate the missing person report. If the officers had attempted, but failed, to speak with Tiffany (who they correctly believed to be in DeQuasie's residence), they would have

As we stated above, there is no "simple rule" that covers all information supplied by informants. However, we have noted that because an informant who meets face-to-face with an officer provides the officer with an opportunity to assess his credibility and demeanor and also exposes himself to accountability for making a false statement, "courts have had no difficulty distinguishing between cases involving face-to-face encounters with informants and cases involving anonymous tipsters." *United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000). Likewise, the Supreme Court has observed that "if an unquestionably honest citizen comes forward with a report of criminal activity — which if fabricated would subject him to criminal liability — . . . rigorous scrutiny of the basis of his knowledge [is] unnecessary." *Gates*, 462 U.S. at 233-34.[21] Additionally, we have recognized that an informant's personal interest can create "a strong motive to supply accurate information." *United States v. Miller*, 925 F.2d 695, 699 (4th Cir. 1991).

---

expended additional time and would have had no additional information to support the warrant. That fact aside, we note that although the district court discounted any significance of the fact that the officers had confirmed the presence of people in DeQuasie's residence on the night in question, *see* 244 F. Supp. 2d at 657, it is significant in at least one respect: had the officers observed the residence and found it to be vacant, there would not have been a reason to believe that Lora was then being held against her will inside. While the presence of people in the residence is a minor, seemingly innocent detail, it nonetheless is not completely irrelevant. *See Gates*, 462 U.S. at 243 n.13 ("innocent behavior frequently will provide the basis for a showing of probable cause").

[21]*See also Blount*, 123 F.3d at 835 ("absent specific reasons for police to doubt his or her truthfulness, an ordinary citizen, who provides information to police at a crime scene or during an ongoing investigation, may be presumed credible without subsequent corroboration"); *Easton v. City of Boulder*, 776 F.2d 1441, 1449 (10th Cir. 1985)("when examining informant evidence used to support a claim of probable cause for a warrant . . . the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness"). Although in *Wilhelm* we criticized the magistrate judge's comment that "a citizen-informer is presumptively reliable," 80 F.3d at 120, we did so within the specific context of that case, rather than as a general principle.

Each of these principles distinguishes this case from *Wilhelm*. Unlike the anonymous informant in *Wilhelm*, Shawn and Cynthia met face-to-face with Deputy Webb when they reported the information to him for preparation of the missing person report. In doing so, they provided Deputy Webb with an opportunity to observe their demeanor and assess their credibility, and they also exposed themselves to potential criminal liability for filing a false report. Moreover, Shawn and Cynthia (as well as Tiffany) had an obvious personal interest in Lora's well-being and a corresponding motive to be truthful, and there is nothing in the record to suggest that Deputy Webb (or the other officers) reasonably should have doubted their credibility.[22]

The affidavit in *Wilhelm* contained wholly conclusory statements which lacked the facts and circumstances from which a judicial officer could have independently determined probable cause. It was truly a "bare bones" affidavit. For the reasons we have noted, Detective-Corporal Sizemore's first affidavit is not. To the extent that the district court based its conclusion that the *Leon* exception is not applicable on this ground, we believe that it erred.

### C.

We also believe the district court erred in its analogy to the "bad faith" circumstances we discussed in *Wilhelm*. As we noted, the district court identified "a number of inconsistencies in Detective-Corporal Sizemore's statements that indicate the absence of an 'objectively reasonable law enforcement activity.'" 244 F. Supp. 2d at 657 (citation omitted). Actually, the "number of inconsistencies" the district court identified is two, and we find that these purported inconsistencies do not support the district court's conclusion.[23]

---

[22]Their personal interest stands in stark contrast to many of the potential interests of informants in drug cases and "other common garden varieties of crime." *See Jaben v. United States*, 381 U.S. 214, 224 (1965) (noting that in a probable cause context the credibility of such informants "may often be suspect").

[23]The district court noted a third "significant inconsistency" that it considered not to be pertinent because it related to the second warrant: despite Detective-Corporal Sizemore's observation of green vegetation that appeared to be marijuana, no green vegetation was seized during the second search. 244 F. Supp. 2d at 657 n.2. While we agree that it is not pertinent to our inquiry, we reject in any event the district court's conclusion that this fact is necessarily an "inconsistency."

First, the district court found Detective-Corporal Sizemore's statement that Lora's "life may be in jeopardy if she continues to stay at [DeQuasie's] residence" to be inconsistent with the fact that officers did not "take[ ] action" such as knock on the door and ask to speak with Lora or inquire about her whereabouts when they observed the residence prior to seeking the warrant. *Id*. While the officers could have taken this step before seeking the warrant, the fact that they did not does not necessarily make Detective-Corporal Sizemore's statement "inconsistent."

Based on the information presented to the officers, an objective law enforcement officer very reasonably could have believed, and the district court did not find otherwise, that although Lora's life or well-being may have been in jeopardy if she continued to stay at DeQuasie's residence, the prudent course was to seek the warrant. While it is certainly possible that an inquiry to DeQuasie by officers prior to obtaining the warrant may have resolved this matter, it is equally possible — and not unreasonable for the officers to have believed — that such an inquiry may have not only proven to be fruitless, but also may have increased the danger to Lora or to themselves.[24] Especially in view of the fact that the officers obtained and executed the first warrant within a relatively short period of time (five hours) following Shawn's original report, we find the district court's conclusion to be without foundation.

---

[24]We have noted in the related context of a qualified immunity claim:

> There are, of course, many instances where pre-arrest interviews serve to confirm or dispel suspicion and where properly conducted conversations with suspects will prove an invaluable investigatory tool. There are also numerous reasons why a reasonable police officer might choose not to interview a suspect prior to arrest. For example, an officer might legitimately fear that questioning may alert a suspect that he is a target of an investigation, enabling him to destroy evidence or flee the jurisdiction before police have established probable cause for his arrest. The decision of whether or not to interview is inescapably discretionary. . . .

*Torchinsky v. Siwinski*, 942 F.2d 257, 263-64 (4th Cir. 1991).

The second purported "inconsistency" on the part of Detective-Corporal Sizemore is more attenuated as it actually relates to a statement made by government counsel in the district court proceedings that is contrary to the evidence in the record. Noting that Tiffany was a subject of the first warrant and that government counsel had asserted before the district court that a possible reason Tiffany was not interviewed prior to the issuance of the warrant was because she was at DeQuasie's residence, the district court pointed to a passage from the United States' district court legal memorandum that reads "'detectives learned that Lora Bandy and Tiffany Mason went to defendant's residence, *but that only Ms. Mason returned*.'" 244 F. Supp. 2d at 657 (citation omitted) (emphasis added by district court). The district court apparently considered this passage of the United States' legal argument to mean that Tiffany had returned from DeQuasie's residence and, consequently, could not be at the residence at any time thereafter. Thus, under the district court's view, this statement *by counsel* demonstrates that Detective-Corporal Sizemore could not have reasonably believed that Tiffany was actually at DeQuasie's residence when he obtained the first warrant.

Notwithstanding counsel's statement that Tiffany had "returned" from DeQuasie's residence, there is no evidence in the record that Tiffany ever left the residence.[25] Indeed, the record on this point actually shows that Lora and Tiffany had gone to DeQuasie's residence and that Tiffany had "contacted" Shawn and Cynthia (presumably by telephone) and told them about the situation. There is nothing in the record to establish that Tiffany was anywhere other than at DeQuasie's residence, and as the events played out that evening, Tiffany was in fact at the residence when the officers executed the first warrant. We therefore believe that it certainly was not unreasonable for Detective-Corporal Sizemore to have believed that Tiffany was at the residence when he sought the warrant.

In any event, were we to consider counsel's statement that Tiffany "returned" from DeQuasie's residence as being supported by the facts of this case, we do not find that it creates an inconsistency with the officers' belief that Tiffany was in DeQuasie's residence that night.

---

[25]Counsel for the United States stated at oral argument that he had mistakenly made this assertion.

Even if Tiffany had actually "returned" from DeQuasie's residence at some point in time, this simply does not establish that she could not, or did not, go back to the residence that night.[26] Indeed, because Tiffany was at DeQuasie's residence when the first warrant was executed, she obviously must have gone back there (if, in fact, she had ever left).

## D.

The officers in this case were presented with specific information from Shawn and Cynthia that Lora was missing and being held

---

[26]Despite finding these purported "inconsistencies," the district court did not make a factual finding that the officers obtained and executed the first warrant for any purpose other than to locate Lora and Tiffany or that they misstated evidence in order to obtain the second warrant. Indeed, there is no evidence in this record to support such a finding. Yet, that is precisely the theory advanced by DeQuasie:

> We would argue that the most reasonable chain of events was an officer who heard second or third-hand of a residence which contained a large quantity of drugs, $20,000.00 in cash, many weapons and scanners, and that these reports excited him to the point that he failed to verify the claims on the chance that the witness would recant. The officer then went to a Magistrate who he worked with a lot and obtained a warrant for the alleged captive despite the lack of support for the claims. When he reached the residence only to find the object of the first warrant outside and in no distress, he stretched a bit to obtain a second warrant to get to his true object, the non-existent drugs and money.

*Brief of Appellee*, at 14. DeQuasie made similar assertions before the district court. *See* J.A. 64 ("[I]t would appear that the officers may have been more excited by the possibility that they might find 'lots of drugs and money,' then [sic] their alleged concern for Ms. Bandy"); J.A. 28 ("In executing the first Warrant and having been presented with evidence that Lora Bandy was not being held against her will as alleged, Officer Sizemore allegedly detected the infamous [odor] of burning marijuana which he used as a basis of a second Warrant supported by the fact that the defendant had two cell phones, the mark of a drug dealer"). DeQuasie also suggests, without evidentiary support, that Shawn fabricated the information he reported. *See Brief of Appellee*, at 9 (Shawn's statement is "pure hearsay with a possible alternative motive").

against her will by DeQuasie in his residence, and that DeQuasie had threatened to kill any family member who attempted to rescue her. This information was reported in a face-to-face meeting with Deputy Webb, and it led to his preparation of a missing person report. No reason appears in the record to suggest that the officers had any reason to doubt the credibility of these family members.

The officers confirmed that there were people in DeQuasie's residence, but they did not attempt to conduct a warrantless entry. Instead, Detective-Corporal Sizemore presented the information the officers had gathered to a magistrate in order for the magistrate to make a probable cause determination and issue a warrant. Detective-Corporal Sizemore set forth the source of the information (including an acknowledgment of Tiffany as a source), the fact that Deputy Webb had met face-to-face with the family members, and the factual circumstances underlying Lora's alleged captivity. He also stated under oath that he believed that Lora's life "may be in jeopardy if she continues to stay at this residence." Despite having information about drug activity at the residence, Detective-Corporal Sizemore did not seek authorization to search for anything other than Lora and Tiffany. The magistrate authorized the officers to conduct a limited search at DeQuasie's residence, and there is no evidence to suggest that they exceeded the scope of the search.[27]

Reasonable minds may differ on whether the officers could have done more investigative work before seeking the first warrant and, perhaps, whether the first affidavit was sufficient to establish probable cause for the search. We need not answer either of those questions today. The issue before us is whether, under all of the specific circumstances of this case, a reasonably well-trained officer would have known that the search for Lora and Tiffany was illegal despite the fact that the magistrate issued the warrant for that search. This requires us

---

[27]In seeking the second warrant, Detective-Corporal Sizemore stated that information attributed to Tiffany concerning the presence of "a large quantity of drugs" and cash in DeQuasie's residence "cannot be judged as to reliability." (J.A. 22). Although this candid admission (about a matter separate from Lora's well-being) relates to the second warrant, it demonstrates that Detective-Corporal Sizemore acted forthrightly in seeking that warrant.

to determine whether Detective-Corporal Sizemore's first affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. For all of the reasons we have set forth above, we conclude that it is not. Therefore, "application of the extreme sanction of exclusion is inappropriate." *Leon*, 468 U.S. at 926.

V

Based on the foregoing, we reverse the suppression order and remand this case to the district court for further proceedings.

*REVERSED AND REMANDED*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

With respect, I dissent. Because the Government inexcusably delayed filing the certification necessary for its interlocutory appeal in this criminal case, I would dismiss the appeal.

Government appeals in criminal cases have long been regarded as "something unusual, exceptional, [and] not favored." *Carroll v. United States*, 354 U.S. 394, 400 (1957). However, in 18 U.S.C. § 3731 (2000), Congress has provided the United States with the right to file an interlocutory appeal of an order suppressing evidence in a criminal case "*if* the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." *Id.* (emphasis added). Here, the Government expressly relied on § 3731 to establish jurisdiction in this court, but failed to comply with that statute's clear directive. Not only did the Government fail to file the requisite § 3731 certification prior to, or concurrent with, its notice of appeal, but it failed to file the certification for more than a year afterwards, in the meantime ignoring notice from this court that certifications must be timely filed. Indeed, the Government waited fourteen months after filing its notice of appeal to finally comply with the statute. It did so then only after this court intervened, ordering the parties to file supplemental briefs on the effect of the Government's failure to file the certification.

The Government's failure to file a § 3731 certification unquestionably constitutes an irregularity in perfecting an appeal, giving an appellate court discretion to take any appropriate action. *United States v. Hatfield*, 365 F.3d 332, 337 (4th Cir. 2004); *see also* Fed. R. App. P. 3(a)(2). Although not a defect depriving an appellate court of jurisdiction, *id.*, noncompliance with § 3731 is viewed with disfavor. Accordingly, courts have readily dismissed appeals in which the Government has failed to file a prompt certification with the district court. *See, e.g.*, *United States v. Salisbury*, 158 F.3d 1204, 1207 (11th Cir. 1998); *United States v. Carrillo-Bernal*, 58 F.3d 1490, 1493-97 (10th Cir. 1995); *United States v. Hanks*, 24 F.3d 1235, 1238 (10th Cir. 1994); *United States v. Miller*, 952 F.2d 866, 875-76 (5th Cir. 1992).

We recently considered precisely the same late certification issue, in a case arising from the same United States Attorney's Office. *Hatfield*, 365 F.3d at 337-38. After weighing the equities in *Hatfield*, we concluded that the "novel legal issue" presented and the fact that we had never before "fully explicated the importance of the certification requirement, and the grave consequences resulting from the [G]overnment's failure to timely file," weighed in favor of hearing the case despite the untimely filing. *Id.* at 338. However, we unequivocally warned the Government that "future failures to timely file will not be taken lightly." *Id.* Despite this admonition, the majority, while claiming that it does not "condone the United States' tardiness in complying with § 3731," *ante* at 10-11, nevertheless deems it "appropriate" to consider the merits of this appeal. *Id.* at 10-11. Because the equities in the case at hand favor dismissal, and because words unaccompanied by any meaningful consequences become empty rhetoric, I must respectfully dissent.

The strongest factor weighing in favor of dismissal is, of course, the extraordinary and inexcusable lapse of time between the filing of the notice of appeal and the filing of the certification. The district court granted DeQuasie's suppression motion on February 20, 2003, and the Government noted an appeal of that order on March 19, *2003*; yet, the Government did not file its certification with the district court until May 4, *2004*. Our sister circuits have dismissed appeals when the Government's delay was considerably less egregious. *See, e.g.*, *Salisbury*, 158 F.3d at 1207 (certification filed one month after notice of appeal); *Carrillo-Bernal*, 58 F.3d at 1491-92 (filed notice of appeal

on July 19, 1994, and filed certification on August 26, 1994); *Hanks*, 24 F.3d at 1237 (certification filed two and one-half months after notice of appeal).

Moreover, in the case at hand, unlike those cases, the record reveals that the Government had specific actual notice of the certification requirement for nearly a year before it finally filed the certificate. Indeed, during the relevant fourteen-month period in which the Government never made an effort to file its § 3731 certification, it received express notification of that requirement on numerous occasions. First, in July 2003, ten months before the Government filed the certification in this case, the defendant in *Hatfield* (a case, as I noted above, from the same United States Attorney's Office) moved to dismiss his appeal because of the Government's failure to file a § 3731 certification in that case. 365 F.3d at 337. Then, in early January 2004, this court issued a supplemental briefing order in *Hatfield*, specifically alerting the Government to the consequences of its failure to file § 3731 certifications. And, in late January, during oral argument in *Hatfield*, we yet again drew the Government's attention to the certification requirement. Further, the *Hatfield* opinion, which issued on April 23, 2004, discussed § 3731 certifications and, as detailed above, warned the Government of the consequences of its failure to file certifications in the future.

Despite these repeated notifications and admonitions, and the Government's earnest assurances to us that it recognized the importance of the certification requirement, the Government still neglected to file the requisite § 3731 certification in the case at hand. It was only after we ordered the Government to submit a supplemental brief on the issue of the lack of a § 3731 certification in this case, that the Government finally complied with the requirements of that statute. Even then, it took the Government more than a week to do so.

The Government does not dispute this chronology. Moreover, it candidly admits the reason for its inordinate delay: prior to July 2003, this particular United States Attorney's office was simply unaware that any certification requirement existed. I am not sure such institutional oversight can ever qualify as a valid excuse for the total failure to comply with § 3731. *See Salisbury*, 158 F.3d at 1207 ("Simple negligence . . . cannot excuse noncompliance with the express mandate

of the statute"); *see also United States v. Smith*, 263 F.3d 571, 578 (6th Cir. 2001) (same). But even if such institutional errors could excuse the Government's failure prior to July 2003 — when the Government acknowledges the *Hatfield* case put it on actual notice as to this requirement — surely it cannot explain the Government's continued failure to file the certificate during the subsequent ten-month period.

Not only is the governmental delay in filing the certificate here a good deal longer than that involved in *Hatfield*, and in the face of actual notice of the certification requirement not present in *Hatfield*, but also this appeal, unlike *Hatfield*, utterly fails to present "a novel legal issue." *Hatfield*, 365 F.3d at 337-38. In *Hatfield*, we addressed an important question involving application of the "knock and announce" rule that needed appellate clarification. *Id.* at 338-41. Conversely, the appeal at hand merely requires application of well-established principles as to the validity of a warrant and the good faith exception to the facts of this case. In this fact-bound area of the law, "[n]o single case such as this one can make any material incremental contribution to the law of suppression." *Carrillo-Bernal*, 58 F.3d at 1496.

Nonetheless, the Government contends that we should ignore its delay and hear the present appeal because DeQuasie suffered no prejudice since he was "released from incarceration without objection by the United States, and the appeal proceeded in a normal fashion." But, in this context, we cannot possibly define prejudice in such a narrow fashion. Otherwise, the prejudice factor would almost always weigh in the Government's favor, and the Government would be permitted to ignore the certification requirement with impunity. *Cf. Hanks*, 24 F.3d at 1238 n.1 (explaining that the certification "requirement would lose meaning if we excuse late performance on the ground that harm is incurable at that point"). Moreover, although DeQuasie may not have been imprisoned during the pendency of his appeal, his liberty was significantly restricted: DeQuasie was subject to home confinement for seven months after the Government filed its notice of appeal, and although he is no longer subject to home confinement or electronic monitoring, he still must comply with other conditions of bond. *Salisbury*, 158 F.3d at 1207 ("[P]re-trial release is still a deprivation

of liberty and the burden of an impending trial weighs heavy on the mind of the accused."); *Hanks*, 24 F.3d at 1238.

Further, despite the Government's current assurances that it has revised its internal procedures to comply with the certification requirement, the efficacy of the Government's new procedures is subject to debate. After all, back in January, the Government also assured us that the "internal procedural flaw had been corrected," yet we find ourselves in the same posture once again. But even if I were to credit fully the Government's representations, dismissal would still be warranted because freely crediting such "[p]ost hoc certification[s] . . . [would] reduce[ ] the § 3731 requirement to a meaningless formality." *Hanks*, 24 F.3d at 1239.

The certification requirement serves an important purpose — it "forces the prosecutor to represent that she [or he] has, in fact, thoroughly and conscientiously considered the decision to appeal" *prior* to filing the appeal. *Salisbury*, 158 F.3d at 1207. This purpose is soundly defeated by the "perfunctory filing of the certificate after the appeal has been docketed[,] briefed," and argued to this court. *Miller*, 952 F.2d at 875. For the certification requirement to have any real meaning, we must be willing to go beyond hollow admonitions and hold the Government to its statutory obligation. In *Hatfield*, we expressly put the Government on notice that we intended to vigorously enforce the certification requirement. This is the appropriate time to breathe life into our warning and dismiss the Government's appeal.

In closing, I want to make it clear that I do not question the integrity or ability of the United States Attorney's Office, or the particular prosecutor, involved in this case. Both have performed admirably in other instances. But in this case the Government inexcusably erred in failing to act in a timely manner. When a defendant errs in this way — for example, in failing to timely raise a suppression claim — we do not hesitate to impose on him the consequences of that error. *See, e.g.*, *United States v. Ruhe*, 191 F.3d 376, 385-87 (4th Cir. 1999). Simple justice requires us to treat the Government in the same fashion.