UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-4219

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

KEVIN NEWLAND, a/k/a Kevin Kairo,

Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge. (1:05-cr-00458-RDB)

Argued: September 21, 2006                Decided: June 6, 2007

Before WILLIAMS and GREGORY, Circuit Judges, and Thomas E. JOHNSTON, United States District Judge for the Southern District of West Virginia, sitting by designation.

Reversed and remanded by unpublished opinion. Judge Johnston wrote the opinion, in which Judge Williams concurred. Judge Gregory wrote an opinion concurring in part and dissenting in part.

**ARGUED:** Gregory Welsh, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellant. Fred Warren Bennett, BENNETT & BAIR, L.L.P., Greenbelt, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellant. Gary E. Bair, BENNETT & BAIR, L.L.P., Greenbelt, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

JOHNSTON, District Judge:

The Government appeals the district court's order granting Kevin Newland's motion to suppress evidence seized from a search of his rental vehicle on September 21, 2005. Based on statements given to officers and immigration agents on the road side and while in state custody, Mr. Newland was indicted for falsely and willfully representing himself to be a citizen of the United States. On the merits, we reverse the district court's suppression order because the trooper who stopped Mr. Newland had reasonable suspicion to detain him until the canine unit scanned the vehicle. Once the canine alerted to the presence of narcotics, the officers had probable cause to search the vehicle.

I.

A.

On September 21, 2005, Maryland State Trooper David McCarthy (Trooper McCarthy) was conducting drug interdiction on Interstate 95.[1] At approximately 11:57 a.m., Trooper McCarthy stopped a white Ford Taurus with Georgia plates for speeding northbound in Cecil County, Maryland. He approached the passenger side of the vehicle and noticed an open cell phone line and several other cell phones

---

[1]Trooper McCarthy is a member of Pro-Active Criminal Enforcement Team, a state police task force specifically trained to identify possible drug traffickers on I-95. (J.A. 37.)

2

in the vehicle's console.  Trooper McCarthy asked the driver, the car's sole occupant, for his license and registration and directed him to close the open cell phone.  Trooper McCarthy noticed that the driver's hands were shaking "uncontrollably" while he gathered the requested paperwork and that he appeared extremely nervous. (J.A. 170)

The driver produced a United States Virgin Islands driver's license and a rental agreement for the Taurus.  When Trooper McCarthy asked for his current address, the driver stated that he was living in Washington, D.C.  The rental agreement, however, listed a Maryland address.  When Trooper McCarthy asked the driver why he used a Maryland address to rent the car if he lived in Washington, D.C., the driver hesitated, and "eventually" said that it was his girlfriend's address.  (J.A. 170)  According to Trooper McCarthy, the driver's nervousness persisted.

Trooper McCarthy returned to his vehicle.  He examined the license and immediately suspected that it was fraudulent, but was unable to verify its authenticity because the Maryland State Police do not have access to a database that includes the Virgin Islands. Based on his interaction with the driver, Trooper McCarthy requested that Trooper Catalano and his canine unit respond to the scene.  He then proceeded to conduct a warrant check in the name of Kevin Kairo.  Approximately two minutes later, the warrant check was returned negative.

Around the time that Trooper McCarthy was reviewing the driver's paperwork, Troopers Connor and Lewis arrived at the scene. Trooper Connor also thought the license looked suspicious, and approached the driver, who was still seated in his vehicle. When Trooper Connor asked the driver about his destination, he informed the trooper that he was traveling to New York City to play soccer.

Troopers McCarthy and Connor discussed the driver's statements and nervous demeanor, and both observed that there was no visible luggage in the back seat. They also noticed that the rental car was due to be returned in Maryland in only a few hours despite the driver's plans to visit New York City.

Trooper Catalano and his drug detection dog arrived on the scene shortly after Troopers Connor and Lewis, at approximately 12:08 p.m. The driver was asked to exit the vehicle during the scan pursuant to standard procedure. At 12:10 p.m., the dog scanned the exterior of the vehicle and alerted to the presence of narcotics at the front passenger window. Based on the canine's positive alert, the troopers searched the car and discovered $55,729 in cash inside a nylon bag located on the front passenger seat. The driver claimed that he owned the bag but did not know how the money got inside the bag. The canine then conducted a scan on the cash and alerted to the presence of narcotics.

The driver was taken into custody and brought to the Maryland State Police barracks to verify his identity. A finger print

4

identification check sent to the Federal Bureau of Investigation (FBI) failed to produce results. The state police then contacted the United States Bureau of Immigration and Customs Enforcement (ICE). Agent Robin Betkey responded and contacted the U.S. Virgin Islands Police. Agent Betkey's contact in St. Croix informed her that there was no valid driver's license in the name of Kevin Kairo and the address on the license did not exist in St. Thomas. Agent Betkey then searched for the driver's fingerprints in the ICE database. The ICE database identified the driver as Kevin Newland, a citizen of Jamaica who was lawfully present in the United States. The database also revealed that there was an outstanding warrant for Mr. Newland's arrest in Maryland for possession of a controlled substance with intent to distribute.

A subsequent FBI analysis proved that the driver's license and U.S. Virgin Island's birth certificate, which was provided by Mr. Newland's wife at the police barracks, were fraudulent. Mr. Newland was charged with falsely and willfully representing himself to be a citizen of the United States in violation of 18 U.S.C. § 911.

B.

Mr. Newland filed a motion to suppress the birth certificate, money seized, and all subsequent statements made to law enforcement officers after Trooper McCarthy received the negative warrant check. At the suppression hearing, Trooper McCarthy testified that

5

he detained Mr. Newland because he suspected that the driver's license was fake and therefore could not properly execute the warning ticket without knowledge of the driver's true identity. He also testified that he detained Mr. Newland based on the totality of the circumstances, which included Mr. Newland's statements and nervous demeanor during their initial discussion at the road side.

Troopers McCarthy and Connor both testified at the suppression hearing that the license was an obvious fake and that Mr. Newland's detention was therefore reasonable based on the totality of the circumstances. The district judge questioned both troopers thoroughly about their reasons for believing the license was fraudulent. Trooper McCarthy testified that the hologram was faded and distorted. Trooper Connor testified that the font on the license was of poor quality and that it was thicker than a standard license. He also testified that the grey haze behind the lettering indicated that the license was not authentic.

The district judge closely examined the license based on the testimony of the troopers. The court also compared the license to a proffered Maryland license to compare its width and length. Despite close scrutiny, the district judge did not discern the abnormalities described by the troopers. The trial judge proceeded to find that the U.S. Virgin Islands driver's license was not an "obvious fake." [J.A. 138] Based on this finding, the court found that Trooper McCarthy's suspicion about the license did not justify

6

the trooper's decision to detain Mr. Newland once he received the negative warrant check. The court further found that Trooper McCarthy needed reasonable suspicion of a serious crime to continue to detain Mr. Newland beyond the warrant check. The trial court found that Trooper McCarthy's testimony failed to articulate such a suspicion, and granted Mr. Newland's motion to suppress.

## II.

We first address Mr. Newland's motion to dismiss. On October 31, 2006, Mr. Newland moved to dismiss this appeal because the Government failed to file a timely Certification of the United States Attorney in accordance with 18 U.S.C. § 3731. "Section 3731 permits the United States to file an interlocutory appeal from an adverse suppression ruling (before the defendant has been put in jeopardy and before the verdict or finding on an indictment or information) only if it makes that certification to the district court." United States v. Dequasie, 373 F.3d 509, 515 (4th Cir. 2004). We have previously expressed our assumption that the certification must be filed within the same 30-day period for which the United States must notice an appeal under § 3731. See DeQuasie, 373 F.3d at 515 n.6; In re Grand Jury Subpoena, 175 F.3d 332, 337 (4th Cir. 1999).

"The certification requirement of Section 3731 operates to ensure that before the United States interrupts a criminal

proceeding (and thereby delays a defendant from obtaining resolution of the charges against him) by taking an interlocutory appeal, it has evaluated whether the appeal is warranted." Dequasie, 373 F.3d at 515. "The certificate is not a mere formality; its purpose is to protect the accused from undue delay." United States v. Herman, 544 F.2d 701, 794 (5th Cir. 1977). That purpose is thwarted by the perfunctory filing of the certificate after the appeal has been docketed and briefed. We have previously warned the Government that "future failures to timely file will not be taken lightly." Hatfield, 365 F.3d at 338. We now have two additional appeals raising the same issue, this case and United States v. McNeill, No. 06-4444, which is being decided with this case. Although there is no assertion that the Government acted in bad faith or with a dilatory motive, its actions have caused a significant procedural flaw in this appeal and in McNeill.

We have outlined several factors to determine whether an appeal should proceed despite the § 3731 irregularity: (1) how late the certification was filed, (2) the reason for its lateness, (3) whether the Government engaged in a "conscientious pre-appeal analysis" and is appealing in good faith, (4) whether the Government acknowledges the importance of the certification, (5) prejudice to the defendant, (6) the need for appellate clarification of novel or complex legal issues, and (7) "whether

8

the appeal should be heard in the interests of justice." Hatfield, 365 F.3d at 337-38; see also DeQuasie, 373 F.3d at 516.

In short, because the certification requirement is intended to protect the defendant from undue delay, the most salient factors to consider must relate to whether the Government's failure to file the certification as required caused actual substantial prejudice to the defendant. See DeQuasie, 373 F.3d at 517 (Courts are not likely to dismiss an appeal unless the defendant is able to show "actual substantial prejudice"(quoting United States v. Smith, 263 F.3d 571, 578 (6th Cir. 2001)).

Oral argument was heard on this appeal on September 21, 2006. The Government did not file the certificate until October 13, 2006, almost eight months after the Notice of Appeal was filed. This is a serious delay and a large lapse in professionalism on the part of the Government. However, in consideration of the McNeill case and the Government's articulated position, several factors tilt the equities of retaining this appeal in the Government's favor.

As previously stated, there is no suggestion that the government acted in bad faith or with a dilatory motive. The suppression hearing below was handled by an Assistant United States Attorney who left the United States for official duty in Iraq shortly after his filing the Notice of Appeal in this case. Before leaving the country, he communicated with the Appellate Section of the Criminal Division, Department of Justice, and began the process

of obtaining the permission of the Solicitor General to pursue this appeal. An Order was issued by this Court on March 7, 2006, setting a briefing schedule. As a result, the case was transferred to Gregory Welsh, the Assistant U. S. Attorney now handling this appeal. On April 10, 2006, the appeal was authorized by the Solicitor General.

Section 3731 does not give a deadline by which the government must file the certification. We have assumed, however, without deciding, that because it is necessary to the perfection of an appeal, the government must file the certification within the 30-day period for appeal of the interlocutory order. See 18 U.S.C. § 3731; DeQuasie, 373 F.3d at 515 n.6; In re Grand Jury Subpoena, 175 F.3d at 337. To give effect to the § 3731 protections and to remove doubt about when it must be filed, we now hold, in conjunction with McNeill, that the certification must be filed with the notice of appeal filed by the Government under § 3731. This requirement assures that the Government will have determined that the appeal is warranted under § 3731 before disrupting the trial process by noticing an appeal. In imposing this requirement, we join other courts that have imposed a similar requirement. See, e.g., United States v. Salisbury, 158 F.3d 1204, 1207 (11th Cir. 1998); United States v. Bailey, 136 F.3d 1160, 1163 (7th Cir. 1998).

The U.S. Attorney's Office did not realize its omission in this case until October 12, 2006, when the United States Attorney himself realized that the certification he had signed in McNeill had been filed in this Court, not the district court as required by § 3731. This prompted the U.S. Attorney to check with the Assistant U.S. Attorney handling this case (a similar interlocutory appeal) to inquire whether the § 3731 certificate had been properly filed. The U.S. Attorney learned that a certificate had not been filed, and directed that a certificate be properly filed in this case and in McNeill.

This omission went unnoticed not only by the Government, but also by Mr. Newland, his counsel, and this Court. We question whether the omission would have ever been noticed had the Government not filed the certification. However, rather than ignore an irregularity created by his office, the U. S. Attorney himself stepped in to address the problem and rightly filed the certification in both cases. The U.S. Attorney also filed a declaration as an attachment to the Government's opposition that announced a new § 3731 policy for that U. S. Attorney's office. Specifically, the U. S. Attorney instituted a new guideline regarding § 3731 certifications that was circulated to all of his assistants and each U. S. Attorney in the Fourth Circuit. He amended the U.S. Attorney practice manual for his office and requested similar amendments to the manuals issued by the

11

Department of Justice. It is thus clear that the Government acknowledges the importance of the certification requirement.

Most important, Mr. Newland does not appear to have suffered actual substantial prejudice from the delayed certification. Mr. Newland contends that he was prejudiced because at the time of his arrest he faced additional charges in another jurisdiction and was delayed in obtaining resolution of those charges. Mr. Newland was detained for approximately five months on the instant charge before he was transferred to the other jurisdiction upon the filing of the notice of appeal in this case. The appeal itself proceeded on time despite the delayed certification. As no one contends that the Government is required to file a § 3731 certification before the notice of appeal, it is difficult to find that Mr. Newland suffered substantial prejudice. We do not think that a timely certification would have affected his transfer to a separate jurisdiction.

Here, as in Dequasie, the issues raised on appeal are significant and will further assist in defining the boundaries drawn by the Fourth Amendment. Although not every factor articulated here supports the Government's position, the interests of justice weigh in favor of exercising our discretion to hear this

appeal.[2]  Accordingly, we deny Mr. Newland's motion to dismiss.  We now turn to the merits.

## III.

### A.

The determination of whether given facts amount to reasonable suspicion <u>vel non</u> is a legal one, which we review <u>de novo</u>.  <u>United States v. Foreman</u>, 369 F.3d 776, 782 (4th Cir. 2004).  We give deference, however, to the trial court's factual determinations.  <u>Id.</u>  "[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."  <u>Ornelas v. United States</u>, 517 U.S. 690, 699 (1996).

---

[2]Although the entire Justice Department was certainly on notice of <u>Hatfield</u> and <u>Dequasie</u>, as a practical matter we realize that he Government is not an omniscient monolith, and this is particularly significant when one considers that both <u>Hatfield</u> and <u>Dequasie</u> involved the same U. S. Attorney's office in a state other than Maryland.  We note that the U. S. Attorney for the District of Maryland has requested that the Appellate Section of the Criminal Division of the Department of Justice make it a policy to ensure the filing of the § 3731 certification whenever the Solicitor General approves such an appeal.  Whether instituted by the Solicitor General, the Criminal Division, or each U. S. Attorney, we strongly encourage the Government to adopt such a policy as soon as practicable.  In the wake of this opinion and <u>McNeill</u>, any reason offered by the Government for a future failure to file a timely § 3731 certification will be viewed, at best, with skepticism.

B.

The Government argues that the trial judge erroneously ruled that the canine sniff occurred outside the scope of the traffic stop. The Government also asserts that, based on the totality of the circumstances, Trooper McCarthy had the requisite suspicion to detain Mr. Newland until the canine scanned the vehicle.

Mr. Newland contends that the district court correctly concluded that Trooper McCarthy unreasonably prolonged the traffic stop in violation of the Fourth Amendment. He concedes that he was lawfully detained, but asserts that his rights were violated when he was held for thirteen minutes while Trooper McCarthy followed his "hunch" that Mr. Newland's nervousness and conflicting answers signaled that criminal activity was afoot. Terry v. Ohio, 392 U.S. 1, 27 (1968).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief and limited purpose, constitutes a seizure of a person within the meaning of the Fourth Amendment." United States v. Brugal, 209 F.3d 353, 356 (4th Cir. 2000)(quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)). As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of a road side

14

seizure "must strike a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975).

We previously defined the proper scope of a routine traffic stop in United States v. Rusher, explaining that "an officer may request a driver's license and vehicle registration, run a computer check and issue a citation." 966 F.2d 868, 878 (4th Cir. 1992). However, once "the driver has produced a valid license and proof that he is entitled to operate the vehicle he must be allowed to proceed on his way . . . ." Id. at 876. A seizure "justified solely on the basis of issuing a citation can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). Thus, once the traffic stop is complete, any continued detention of the driver violates the Fourth Amendment unless the officer develops a reasonable, articulable suspicion of a serious crime. Florida v. Royer, 460 U.S. 491, 498 (1983); Foreman, 369 F.3d at 781.

The concept of reasonable suspicion is "a commonsensical proposition" and the trial courts "are not remiss in crediting the practical experiences of officers who observe, on a daily basis, what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). The standard of reasonable suspicion does, however, require "a minimum level of objective justification

15

for the police action." Brugal, 209 F.3d at 359 (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). It demands more than an officer's "inchoate and unparticularized suspicion" or "hunch that criminal activity is afoot." Brugal, 209 F.3d at 359 (quoting Terry, 392 U.S. at 27)). In the context of a routine traffic stop, the "articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." Foreman, 369 F.3d at 781.

## C.

We think the reasoning of the trial court here departs from our decisions in Foreman and Brugal. See Foreman, 369 F.3d at 782; Brugal, 209 F.3d at 359. "The Supreme Court has recognized that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion." Brugal, 209 F.3d at 359 (citing Sokolow,490 U.S. at 9). Simply put, an officer is not required to eliminate the possibility of innocent conduct for the seizure to pass constitutional muster. United States v. Arvizu, 534 U.S. 266, 277 (2002) (citing Wardlow, 528 U.S. at 125).

Here, Trooper McCarthy, an officer with special training and experience in the identification of drug trafficking and who had seen "probably hundreds of fake identification[s]" prior to stopping Mr. Newland, (J.A. at 42), immediately believed that Mr. Newland's license was fake. At the suppression hearing, both McCarthy and Trooper Conner, who also possesses extensive

16

experience with fake identifications, described in some detail the reasons for their suspicions about Mr. Newland's license. Although the district court discounted the officers' observations about the license based on its own inspection, the court never made an adverse credibility finding about their testimony, and the court acknowledged that it does not look at fake driver's licenses "on a routine basis." (J.A. at 156.)

Also, Mr. Newland was traveling on I-95, a major thoroughfare for narcotics trafficking. Brugal, 209 F.3d at 358 n.5 (I-95 is a well known drug corridor); Foreman, 369 F.3d at 785 (characteristics of location in which the officer encounters vehicle is a significant factor in formulating reasonable suspicion) (citing Brignoni-Ponce, 422 U.S. at 884). In fact, I-95 is so well known for its use by drug traffickers that this circuit has twice recognized that travel on I-95 is a valid factor in a reasonable suspicion analysis. Brugal, 209 F.3d at 358 n.5; United States v. Raymond, 152 F.3d 309, 311 (4th Cir. 1998). In addition, each state in this circuit through which I-95 passes has acknowledged its reputation as a drug corridor. (J.A. 37) (Maryland);United States v. Vidal, 119 Fed. App'x 510, 511 (4th Cir. 2005) (citing Brugal with approval for the proposition that travel on I-95 is a factor contributing to reasonable suspicion); United States v. Bodie, 983 F.2d 1058, 1059 (4th Cir. 1992)(Virginia)(defendants apprehended on I-95 in close proximity

to heavy drug trafficking area); <u>Limonja v. Com.</u>, 383 S.E.2d 476, 482 (Va. App. 1989) (I-95 North a known drug trafficking route); <u>United States v. Thorpe</u>, 36 F.3d 1095, 1096 (4th Cir. 1994) (North Carolina); <u>Brugal</u>, 209 F.3d at 358 n.5 (South Carolina).  Although we have not yet taken judicial notice of this fact, we do so now, and recognize I-95 as a major thoroughfare for narcotics trafficking.[3]

When Mr. Newland produced his license and rental agreement, his hands "were shaking uncontrollably."  (J.A. 170); <u>Wardlow</u>, 528 U.S. at 124 (physical signs of nervousness and evasive behavior is a pertinent factor in determining reasonable suspicion)(citing <u>Brignoni-Ponce</u>, 422 U.S. at 885 (same)); <u>Sokolow</u>, 490 U.S. at 8-9 (same); <u>Florida v. Rodriquez</u>, 469 U.S. 1, 6 (1984) (same); <u>Foreman</u>, 369 F.3d at 785 (same).  Although Mr. Newland's shaky hands alone are not sufficient to establish reasonable suspicion, we should not discount Trooper McCarthy's ability to ascertain the severity of Mr. Newland's nervousness in comparison to the behavior of motorists he has encountered in the past.  <u>See</u> <u>Lender</u>, 985 F.2d at 154 (courts are not remiss in crediting the practical experiences

---

[3]Courts of Appeals may take judicial notice of any fact not subject to reasonable dispute if it is generally known within the territorial jurisdiction of the trial court and is capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.  Fed. R. Evid. 201(f) (judicial notice may be taken at any stage of proceeding); <u>Flath v. Bombardier, Inc.</u>, 217 F.3d 838 (4th Cir. 2003).

18

of officers who observe, on a daily basis, what transpires on the street); Foreman, 369 F.3d at 785 (shaking hands indicative of nervousness and pertinent factor in reasonable suspicion determination).

Mr. Newland also provided three different and conflicting addresses to Trooper McCarthy - St. Thomas, Washington, D.C., and Maryland. He also observed Mr. Newland's obvious hesitation when asked to explain why the Maryland address was used on the rental agreement. See Wardlow, 528 U.S. at 124 (evasive behavior and hesitation during questioning are pertinent factors in determining reasonable suspicion).

In addition, Trooper McCarthy testified that he noticed multiple cell phones in the vehicle's console. While the presence of multiple cell phones, by itself, may not be suspicious, when taken together with the other circumstances present in this case, this factor contributes to the process of elimination of a substantial portion of innocent travelers. Foreman, 369 F.3d at 781.

Under the totality of these circumstances, it was not unreasonable for Trooper McCarthy to suspect that Mr. Newland was trafficking narcotics. Brugal, 209 F.3d at 361-62 (use of rental vehicle common method to transport drugs); Wardlow, 528 U.S. at 12 (determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior). Trooper McCarthy's

19

suspicion was further reinforced by Troopers Connor and Lewis, who arrived "shortly" after Trooper McCarthy had called for back up. (J.A. 45.) When Trooper Connor asked Mr. Newland about his destination, he stated that he was on his way to New York City, a known narcotics source city, to play soccer. See Brugal, 209 F.3d at 361-62 (travel on known drug corridor coupled with rental car and destination to New York, a known source city, all factors contributing to reasonable suspicion). In addition, Troopers McCarthy and Connor testified that they were suspicious about Mr. Newland's travel plans because the Maryland rental agreement was due to expire later that afternoon, despite the defendant's plans to travel to New York. The troopers also noted no visible luggage in the car. Brugal, 209 F.3d 353 at 359 (noting unusual travel plans and inadequate luggage as factors contributing to reasonable suspicion).

In United States v. Arvizu, the Supreme Court found that children waiving in a mechanical fashion to a border patrol agent from the rear window of a minivan was, standing alone, a seemingly innocuous event, but when coupled with the remote location of the minivan, its presence on a route frequented by drug smugglers, the evasive behavior of the driver, and the elevated position of the passengers' feet, his observations were enough to amount to reasonable suspicion. 534 U.S. 266, 277 (2002). The Supreme Court has consistently rejected attempts by lower courts to evaluate and

reject factors in isolation from each other because this approach "does not take into account the 'totality of the circumstances' as our cases have understood that phrase." Id.

In our opinion, the factors articulated by Trooper McCarthy, a state trooper with six years of experience, eliminate a substantial portion of innocent travelers.[4] Foreman, 369 F.3d at 785 (nervous behavior, coupled with travel on known drug corridor in a rental vehicle and destination to New York City, a known source city, and unusual travel plans sufficient to establish reasonable suspicion); see Arvizu, 534 U.S. at 274-75 (rejecting evaluation of "innocent travel" factors in insolation from each other and advising against a "divide-and-conquer" approach when determining sufficiency of reasonable suspicion).

The information supplied by Mr. Newland justified a lengthier stop. We conclude that it was reasonable to detain Mr. Newland long enough for the canine unit to arrive and confirm or deny Trooper McCarthy's suspicions. The canine drug scan began approximately thirteen minutes after Mr. Newland was stopped. Given the totality of the circumstances, we cannot say that Troopers Cooper and Lewis' response time made the length of the stop unreasonable. There was also no unreasonable delay caused by Trooper Catalano. The whole affair lasted less than fourteen

---

[4]Because we conclude that Officer McCarthy had reasonable suspicion to detain Mr. Newland until the arrival of the canine unit, it is not necessary to address whether the canine scan occurred within the scope of Mr. Newland's concededly lawful traffic stop, as the Government asserts. See Caballes 543 U.S. at 407.

minutes.  Once the canine alerted to the presence of drugs, the troopers had probable cause to search the vehicle.  <u>United States v. Jeffus</u>, 22 F.3d 554, 557 (4th Cir. 1994).  Accordingly, we reverse the holding of the district court and deny the motion to suppress.

IV.

We disagree with the Government's position that Newland was required to file a cross-appeal to assert his argument contesting probable cause for his arrest.  This argument is essentially an alternate legal theory to affirm the district court's suppression order and would not expand his rights under that judgment.  <u>See United States v. American Railway Express Co.</u>, 265 U.S. 425, 435-36 (1924).  However, it is clear from the record that the presiding judge was primarily concerned with the facts and events leading up to the canine scan. (J.A. 149)  At the suppression hearing, when the parties attempted to explore the issue, the court expressed that it was primarily concerned with the events before the canine search and encouraged the parties to return to that issue.  (J.A. 141).  Thus, we think the record may be insufficient to carefully scrutinize whether the troopers had probable cause to arrest Mr. Newland and at least unclear whether the parties had a full opportunity to introduce evidence on that issue.  <u>Walker v. True</u>, 399 F.3d 315, 326 (4th Cir. 2005).  The record is further unclear regarding whether the district court actually ruled on the probable cause issue because the transcript of the suppression hearing does

22

not reflect an application of the probable cause standard, or any explicit ruling on the propriety of the arrest.  Accordingly, we remand the probable cause issue to the district court for further development.

V.

For the reasons stated herein, we reverse the suppression order and remand this case to the district court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED

23

GREGORY, Circuit Judge, concurring in part and dissenting in part:

Today the majority further erodes the requirement that a police officer have reasonable suspicion of serious criminal activity before prolonging a traffic stop to allow a canine unit to arrive and conduct a sweep of the stopped vehicle. The majority reaches its decision despite the fact that the factors relied upon in support of the finding of reasonable suspicion, considered separately and in their totality, do not exclude a majority of innocent travelers. Because reasonable suspicion that Kevin Newland was committing a serious crime did not exist, I would affirm the ruling of the district court to exclude the evidence that resulted from the canine sweep. I respectfully dissent from the majority on this point.

I.

Because I believe that the Government's failure to file timely certification under 18 U.S.C. § 3731, when considered in light of the relevant factors, should not result in dismissal of the Government's appeal, I concur in Part II of the majority's decision.

II.

Although I agree with the majority's general account of the facts, I believe that our inquiry must focus on the events only up until the point that Newland's stop was prolonged beyond the time necessary to complete a traffic stop. Thus, I recount the facts

24

from the initial stop until the point I believe that the reasonable suspicion inquiry must cease.

On September 21, 2005, Maryland State Trooper First Class David McCarthy pulled over a car driven by Newland northbound on Interstate 95 ("I-95") in Cecil County, Maryland. Once the vehicle pulled off to the right shoulder of the highway, Trooper McCarthy approached the vehicle and advised Newland that he had been stopped for speeding. Trooper McCarthy noticed that Newland had an open cellular telephone, as well as additional cellular telephones in the vehicle. For his protection, Trooper McCarthy requested that Newland close the open cellular telephone. Trooper McCarthy then requested Newland's license and registration.

In response to Trooper McCarthy's request, Newland provided a U.S. Virgin Islands driver's license in the name of "Kevin Kairo." Trooper Newland also indicated that the car was a rental vehicle and provided McCarthy with the rental agreement. When Newland handed both of these documents to Trooper McCarthy, his hands were "shaking uncontrollably." J.A. 170. Trooper McCarthy's initial observation about the rental agreement was that there was a different address on the agreement than Newland had given as his current address. Trooper McCarthy questioned Newland about his address, and Newland "hesitated and eventually advised" that the address on the agreement was his girlfriend's address. J.A. 170.

Trooper McCarthy did not question Newland about the license or about his destination, but returned to his patrol vehicle and radioed for backup "for . . . safety" as he felt that the stop was

more than "just a routine traffic stop at [that] point." J.A. 15. One of the backup troopers that McCarthy requested was a canine handler. Trooper McCarthy made such a request because "there was certain things with my brief contact with the defendant that raised my suspicions that something other than this traffic stop, something else was occurring." J.A. 15. When Trooper McCarthy decided to wait for the arrival of a canine unit, a procedure that the district court found was not routine in all speeding stops of drivers going 74 miles per hour on I-95 in Cecil County, he necessarily made the decision to prolong the traffic stop beyond the time necessary to "request a driver's license and vehicle registration, run a computer check and issue a citation." United States v. Rusher, 966 F.2d 868, 878 (4th Cir. 1992). Although Trooper McCarthy may have based his decision on his belief that Newland's license was obviously fraudulent, that reason was rejected by the district court—a factual finding the majority does not explicitly dispute. Thus, the decision to prolong the traffic stop cannot be supported by Trooper McCarthy's belief about the authenticity of Newland's license; reasonable suspicion must be established through other factors.

After calling for back up, Trooper McCarthy ran a warrant check on "Kevin Kairo," which came back negative. While writing a traffic warning for speeding, he examined the rental agreement further and noted that the car was due back to the rental agency in Silver Spring, Maryland four hours from the time of the stop. He could have finished writing the ticket at this point, after the

warrant check had come back negative. The district court, however, clearly found that he delayed finishing the ticket to allow Trooper Christopher Conner and Sergeant Michael Lewis to arrive. See J.A. 146 ("So you have him turn over the driver's license. He turns over a rental agreement because it's a rental car. And for some reason, there's then a delay and there's a discussion and the next thing we've got, a total of three other police officers arriving and then we have a dog alert."); id. at 158 ("For a period of time, the defendant was kept in his car. Trooper McCarthy waited for further backup. Ultimately, the record reflects and the Court finds that Sergeant Lewis arrived, another police officer arrived and the fourth police officer . . . arrived."); id. ("With respect to the vehicle registration that was provided, running a computer check that was done in terms of a warrant check. There was clearly time to issue a citation. There was simply no reasonable suspicion of a serious crime."). Accordingly, I believe that we must find reasonable suspicion through the factors adduced by Trooper McCarthy prior to the arrival of Trooper Conner and Sergeant Lewis if we are to uphold the canine sweep. The conversation between Trooper Conner and Newland, during which Newland discussed his travel plans, cannot be considered as part of the inquiry because it occurred after Trooper McCarthy prolonged the traffic stop beyond the time allowed by Rusher.

27

III.

Although we review the existence vel non of reasonable suspicion de novo, we give deference to the factual findings of the district court and, importantly, to the inferences drawn from those facts. See United States v. Arvizu, 534 U.S. 266, 277 (2002). In addition, we review the facts in the light most favorable to Newland, as the prevailing party in the suppression hearing. See United States v. Holmes, 376 F.3d 270, 273 (4th Cir. 2004).

A.

In detailing the reasonable suspicion factors, the majority begins by taking judicial notice that I-95 is a major thoroughfare for narcotics trafficking. I believe that such a fact is inappropriate for recognition through judicial notice; whether I-95 is a major drug trafficking route is a fact subject to reasonable dispute. See Fed. R. Evid. 201(b). I-95 is an interstate highway that runs between Houlton, Maine, and Miami, Florida, for a distance of approximately two thousand miles. There is no doubt that narcotics are trafficked on I-95; given its status as a major north-south thoroughfare running the length of the eastern seaboard, it would be stunning if narcotics were not among the varied cargoes contained within vehicles traveling on the highway. The exact magnitude of drug trafficking on I-95 in Cecil County, Maryland, where Trooper McCarthy stopped Newland, is more complex, however, than acknowledged by the majority's sweeping statement that I-95 is a major thoroughfare for narcotics trafficking.

28

Since January 1995, pursuant to a court order, the Maryland State Police ("MSP") have been required to keep data on traffic stops.[1]  See Samuel R. Gross & Katherine Y. Barnes, Road Work: Racial Profiling and Drug Interdiction on the Highway, 101 Mich. L. Rev. 651, 658 (2002) (noting that the MSP must keep stop data pursuant to settlement in Wilkins v. Md. State Police, No. CCB-93-468 (D. Md. 1993)).  From 1995 through June 2000, MSP data indicate that the MSP made a total of 8,027 vehicle searches.  See id.  Of these, 2,146—or roughly one quarter—were made in the I-95 corridor, the 48.5 mile stretch of I-95 running from Baltimore to the Delaware state line, a stretch that includes Cecil County.  See id. at 662.  In 33.4% of the searches—one out of every three—during this period, police found narcotics in the vehicle.  Id. at 668 tbl. 6.  On the I-95 corridor, narcotics were found in 37.3% of all searches, while elsewhere in Maryland, narcotics were found in 32% of searches.  Id.

At the outset, successful searches on I-95 resulted in seizures of greater quantities of drugs than searches elsewhere in Maryland.  See id. at 697 tbl. 12.  This is not surprising; even if

---

[1]Statistical factfinding of this nature is generally the prerogative of the district court.  In this case, however, because the majority reaches its conclusion through judicial notice, I believe that statistics collected by the Maryland State Police on the frequency of seized narcotics on I-95 cannot be ignored. Furthermore, I believe these statistics, even given their potential inaccuracies, to be a more reasoned way of approaching the issue of whether I-95 is a drug corridor than our taking judicial notice on the basis of broad and sometimes uncontested statements in our prior decisions, given that neither party to this appeal addressed the issue on brief or during oral argument.

I-95 were not a drug corridor, it is a major interstate highway. One would expect seizures on a major interstate to be greater than those on local roads. Of greater relevance to this case is the difference in positive search rates of cars traveling northbound on I-95 versus those traveling south. Overall, there were approximately twice as many searches performed of vehicles traveling southbound on I-95 than those traveling northbound. See id. at 701 tbl. 15. Drugs were found in 41.5% of all searches on southbound vehicles and 23.5% of all searches on southbound vehicles revealed drugs in a quantity that would be consistent with a charge of intent to distribute narcotics. See id. Contrariwise, drugs were found in 32.7% of all northbound vehicles searched, only .7% greater than the percent of vehicles searched not on the I-95 corridor that resulted in the discovery of drugs. In only 4.3% of searches of northbound vehicles were a quantity of drugs found at the intent-to-distribute level. Again, these percentages are more consistent with vehicle searches outside of the corridor, where 3.4% of searches were of intent-to-distribute quantities. See id. at 697 tbl. 12. The authors of the study analyzing the MSP data conclude that in the hunt for drugs on the corridor, "most of the big trophies were bagged flying south." Id. at 697. Thus, it is southbound travel on the I-95 corridor which results in drug seizures far and above locations in the rest of the state. Northbound travelers appear to traffic in narcotics at a rate that is generally equal to drivers on other Maryland roads. Cf. United States v. Stewart-Poppelsdorf, 120 Fed. App'x 230, 233 (10th Cir.

30

2004) (considering, during reasonable suspicion inquiry, direction that car was traveling on known drug route).

Statistics are not inherently reliable, and the MSP data presented above are no exception. See Gross & Barnes at 678-87 (discussing potential errors and biases in the MSP data set). Nevertheless, I present the data for two reasons: First, the existence of data on the issue of drug trafficking on the specific, relevant portion of I-95 northbound, collected by the law enforcement agency that conducted the traffic stop at issue in the instant case, demonstrates the inappropriateness of taking judicial notice of such a fact.[2] Second, the statistics indicate the possibility that while traffic stops of travelers southbound on the I-95 corridor may result in an abnormally high percentage of drug

---

[2]I acknowledge that this Court has "take[n] judicial notice of the fact that South America, in general, and Colombia, in particular, are major sources of the cocaine sold and used in the United States." United States v. Munoz, 974 F.2d 493, 495 (4th Cir. 1992). While I believe that Munoz should have sought to support such a conclusion with verifiable evidence, the conclusion accorded with then-available statistics. See, e.g., Drug Enforcement Agency, U.S. Dep't of Justice, The South American Cocaine Trade: An "Industry" in Transition (1996), http://purl.access.gpo.gov/GPO/LPS65912 (noting that in 1995, major Colombian drug trafficking groups distributed most of the world's cocaine, made from cocaine base produced in Colombia, Bolivia, and Peru). In this case, however, the blanket statement of I-95 as a drug corridor does not fully accord with the statistics gathered by the MSP. Thus, I find Munoz's resort to judicial notice distinguishable from the majority's. Similarly, situations in which courts take judicial notice of a specific neighborhood or area as a high crime area are readily distinguishable from the majority's blanket assertion about a two-thousand mile long highway. Cf. United States v. Evans, 994 F.2d 317, 322 n.1 (7th Cir. 1993) (holding that trial court did not commit plain error in taking judicial notice that alleged crime took place in high-crime area).

seizures, northbound travelers such as Newland are statistically as likely to be trafficking narcotics as any other driver on any other Maryland road.

In the attempt to bolster its decision to take judicial notice of I-95's status as a drug corridor, the majority mischaracterizes the record and previous decisions of this Court. The majority cites Trooper McCarthy's testimony that he is assigned to a team that identifies possible "terrorists, drug traffickers, [and] gun runners" on I-95. J.A. 37. The fact that the MSP has a drug interdiction team that works on I-95 does not constitute an acknowledgment that I-95 is a drug corridor. Similarly, in United States v. Raymond, 152 F.3d 309 (4th Cir. 1998), the court did not make any findings about I-95's status as a drug corridor. The sole discussion of I-95 in Raymond concerned the existence of a division of the South Carolina Highway Patrol "whose members are trained specifically to patrol I-95 looking for drug trafficking activity." Id. at 311. In United States v. Brugal, 209 F.3d 353, 360 (4th Cir. 2000), one of the factors supporting reasonable suspicion was that "Interstate 95 is a major drug thoroughfare," but that factor was undisputed by the parties. Thus, it is erroneous to cite Brugal as holding that I-95 is a major drug thoroughfare. The majority's citation of United States v. Bodie, 983 F.2d 1058, 1992 WL 389290 (4th Cir. 1992), to support the conclusion that Virginia "has acknowledged" (the import of which remains unclear to me) that I-95 is a drug corridor is even more disingenuous. Bodie, an unpublished decision, dealt not with the status of I-95, but with

32

Meadow Street in the Randolph area of Richmond, characterized as "a heavy drug trafficking area." Id. at *1. Bodie does not contain any acknowledgments by Virginia, a district court in Virginia, or this Court on I-95's status.

Finally, by taking judicial notice of I-95's status as a drug corridor, the majority provides Newland with a concrete ground supporting rehearing of this case. Federal Rule of Evidence 201(e) provides that "[a] party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." In this case, Newland objected at the suppression hearing to judicial notice of the I-95-corridor issue and has thus preserved the issue on appeal. Normally, given that the issue of judicial notice and I-95 arose during the suppression hearing, Newland should have addressed any objections in his brief. In this case, however, the Government's opening brief omitted any mention of I-95's status as a drug corridor from the list of the reasonable suspicion factors.[3] Accordingly, given that the majority relies on judicially noticing I-95's status as a drug corridor and that Newland has objected to this and has not waived such objection, I believe that Rule 201(e) affords Newland a right to be heard on this issue upon rehearing of this case.

---

[3]The Government's list of factors supporting reasonable suspicion included the fact that drug traffickers frequently produce false identification when stopped on I-95, but no claim that I-95 is a drug corridor.

33

B.

In addition to improperly taking judicial notice about I-95, the majority bolsters the reasonable suspicion inquiry by wrongfully considering Trooper McCarthy's suspicions about Newland's license. Despite the district court's factual finding that Newland's license was not obviously fraudulent, the majority concludes that this finding was not an adverse credibility finding with regard to Trooper McCarthy (and the other officers) and appears to consider Newland's license in the reasonable suspicion inquiry. Insofar as the majority attempts to use the lack of an adverse credibility finding as support that we may consider Newland's license in the reasonable suspicion inquiry, this conclusion is patently incorrect. The district court concluded that the license was not obviously fraudulent and excluded it from the reasonable suspicion inquiry. While we review the existence of reasonable suspicion de novo, we accept the factual findings of the district court absent clear error and give due weight to the inferences the district court drew from those facts. See United States v. Foreman, 369 F.3d 776, 782 (4th Cir. 2004). The majority does not argue that the district court clearly erred in concluding that the license was not an obvious fake. Thus, our standard of review precludes Trooper McCarthy's doubts about the authenticity of Newland's license from the reasonable suspicion inquiry, notwithstanding the majority's attempt to reject, sub silentio, the factual findings of the district court.

34

IV.

Assuming, arguendo, that I-95 is a "drug corridor," the factors supporting reasonable suspicion are: (1) Newland was traveling on I-95; (2) his hands were shaking uncontrollably when he produced his license and rental agreement; (3) he provided three different addresses and hesitated before explaining why he used a Maryland address on the rental agreement; (4) the car was due back in Silver Spring four hours after the stop; and (5) Trooper McCarthy noticed several cellular telephones in the vehicle. I do not believe that these factors, in their totality, exclude a majority of innocent travelers. They cannot, therefore, have given Trooper McCarthy reasonable suspicion that Newland was committing a serious crime.

A.

Although our reasonable suspicion inquiry examines the totality of the circumstances, it is necessary to discuss the individual factors relied upon by law enforcement, both to verify their existence in the case at bar and for their probative value as a link to illegal activity. See, e.g., United States v. Santos, 403 F.3d 1120, 1126-34 (10th Cir. 2005) (weighing each reasonable suspicion factor individually and then the totality of the circumstances); United States v. Boyce, 351 F.3d 1102, 1108-09 (11th Cir. 2003) (reviewing videotape of traffic stop to determine that defendant was not nervous and then excluding that factor from the reasonable suspicion inquiry). After such an inquiry, the factors can then be examined in their totality. See Santos, 403

35

F.3d at 1134 (examining totality of the circumstances after discussing factors in isolation). Although "reasonable suspicion may exist even if 'each of the articulated factors alone is susceptible of innocent explanation,'" <u>Foreman</u>, 369 F.3d at 785 (quoting <u>Arvizu</u>, 534 U.S. at 277), it is "impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." <u>Karnes v. Skrutski</u>, 62 F.3d 485, 496 (3d Cir. 1995).

1. Travel on a known drug corridor[4]

That a traffic stop occurs on a known narcotics corridor cannot support reasonable suspicion on its own and should be given only limited weight in the reasonable suspicion inquiry as a whole. Indeed, the status of a given highway as a drug corridor is ubiquitous in Fourth Amendment jurisprudence. <u>See, e.g.</u>, <u>United States v. Jenson</u>, 462 F.3d 399, 405 (5th Cir. 2006) (I-20); <u>United States v. $49,000,000 in U.S. Currency, More or Less</u>, 208 Fed. App'x 651, 653 (10th Cir. 2006) (I-70); <u>United States v. Blaylock</u>, 421 F.3d 758, 763, 769 (8th Cir. 2005) (I-40); <u>United States v. Powell</u>, 137 Fed. App'x 701, 702, 706 (5th Cir. 2005) (I-45 northbound); <u>United States v. Vasquez</u>, 298 F.3d 354, 355, 357 (5th

---

[4]Despite my disagreement with the majority's taking judicial notice of I-95's status as a major narcotics trafficking corridor and the Government's failure to include the same as a factor supporting reasonable suspicion on brief to this Court, I include this factor in the reasonable suspicion inquiry because I believe that even with its inclusion, reasonable suspicion did not exist.

Cir. 2002) (per curiam) (I-35 and U.S. Highway 59); <u>United States</u> <u>v. Farmer</u>, 215 F.3d 1338, 2000 WL 639474, at *1 (10th Cir. 2000) (unpublished table disposition) (U.S. Highway 54); <u>United States v.</u> <u>Hernandez-Gonzales</u>, 166 F.3d 1222, 1999 WL 41091, at *4 (10th Cir. 1999) (unpublished table disposition) (I-15); <u>United States v.</u> <u>Grillo</u>, 40 F.3d 1245, 1994 WL 620795, at *2 (4th Cir. 1994) (unpublished table disposition) (I-85); <u>United States v. Pino</u>, 855 F.2d 357, 358 (6th Cir. 1988)(I-24); <u>United States v. Aleman</u>, No. CRIM.A 05-261, 2006 WL 91777, at *3 (E.D. La. 2006) (I-12); <u>United</u> <u>States v. Sugar</u>, 322 F. Supp. 2d 85, 88 (D. Mass. 2004) (I-44); <u>State v. Kenyon</u>, 651 N.W.3d 269, 271 (S.D. 2002) (I-29 from Sioux Falls to Sioux City); <u>O'Boyle v. State</u>, 117 P.3d 401, 411 (Wyo. 2005) (I-80).  Given that nearly every stretch of interstate is considered a drug corridor, the fact that a stop occurred on any such route is almost meaningless.  <u>See</u> <u>United States v. Wisniewksi</u>, 358 F. Supp. 2d 1074, 1093 (D. Utah 2005) ("[T]raveling on a 'drug corridor' cannot reasonably support a suspicion that the traveler is carrying contraband.  To so hold would give law enforcement officers reasonable suspicion that every vehicle on every major—and many minor—thoroughfares throughout this country was transporting drugs."), <u>aff'd</u>, 192 Fed. App'x 749 (10th Cir. 2006).  Furthermore, because of courts' willingness to designate various cities and states as "source" regions for narcotics, it is likely that most major roads in this country could be considered drug corridors. <u>See</u> <u>Foreman</u>, 369 F.3d at 795 (Gregory, J., concurring in part and dissenting in part); <u>United States v. Beck</u>, 140 F.3d 1129, 1138 n.3

37

(8th Cir. 1998) (citing cases recognizing, <u>inter</u> <u>alia</u>, Colorado, Texas, Florida, Arizona, the entire West Coast, New Jersey, New York City, Phoenix, Fort Lauderdale, Houston, Chicago, and Dallas as drug source cities or states); <u>State v. Quirk</u>, 842 N.E.2d 334, 343 (Ind. 2006) ("[C]onsidering the substantial number of states and cities that have been designated as sources of drugs, a motorist, in our highly mobile society, would be hard pressed not to travel either from, to, or through a drug-source jurisdiction.").

### 2. Newland's nervous behavior

Although this Court has recognized an individual's nervousness as a factor supporting reasonable suspicion, this factor should be given only limited weight in the context of a traffic stop. <u>See</u> <u>United States v. Richardson</u>, 385 F.3d 625, 630-31 (6th Cir. 2004) ("[A]lthough nervousness has been considered in finding reasonable suspicion in conjunction with other factors, it is an unreliable indicator, especially in the context of a traffic stop. Many citizens become nervous during a traffic stop, even when they have nothing to fear." (citations omitted)).

In this case, although Trooper McCarthy's report mentions Newland's hands shaking uncontrollably, there was no testimony adduced at the hearing on the motion to suppress as to the severity of this reaction compared to that of other motorists whom Trooper McCarthy had stopped or whether Newland's nervousness dissipated throughout the length of the traffic stop. Thus, while I agree

38

with the majority that we should not discount a law enforcement officer's ability to ascertain nervousness through comparison to the behavior of other motorists, there is no such evidence that Newland's nervousness was severe in comparison to other motorists. Accordingly, I would place little weight on Newland's nervousness in the reasonable suspicion inquiry. See Santos, 403 F.3d at 1127 ("Only extraordinary and prolonged nervousness can weigh significantly in the assessment of reasonable suspicion."); United States v. Williams, 271 F.3d 1262, 1268 (10th Cir. 2001) (noting that mere nervousness is of limited significance in reasonable suspicion inquiry, but that extreme and continued nervousness is entitled to somewhat more weight).

3. The rental agreement and Newland's addresses

The fact that Newland was driving a rental car that was due back to the rental company in Silver Spring four hours after the stop is a factor in the reasonable suspicion inquiry. This factor, however, is entitled to minimal weight because there was no testimony connecting the keeping of a rental car over the contracted length and the commission of illegal activity. Nor was there evidence about the financial consequences for Newland had he returned the car late. See, e.g., Santos, 403 F.3d at 1129 (noting lack of testimony that extending rental agreement would have resulted in defendant's paying penalty charges above normal rental fees and that keeping car beyond rental period may "suggest that the driver's travel plans are uncertain or about to change, but,

without more, not that they are implausible"); Boyce, 351 F.3d at 1109 (noting that planning to return rental car late is not equivalent to a suspicious travel plan and is not directly indicative of criminal activity). In addition, the district court found that even if Newland planned on returning the car late, this evidence would not indicate that Newland was committing a crime. This factual inference is entitled to deference. See Arvizu, 534 U.S. at 276-77 (giving deference to district court's determination that a reasonable officer would wonder why defendant's children were methodically waving out back window of minivan).

Newland's having a different residence than the ones listed on his driver's license and the rental agreement, as well as his hesitation when asked to explain the different addresses, is relevant to the reasonable suspicion inquiry. Contrary to the majority's characterization, however, there was nothing "conflicting" about the addresses that Newland provided to Trooper McCarthy. Although the addresses were different, Newland did not claim to live in the Virgin Islands or at his girlfriend's house. Cf. Richardson, 385 F.3d at 631 ("[T]he allegedly conflicting explanations of their travel plans are not mutually exclusive; it is entirely plausible that the group traveled both to see a doctor and a lawyer."). I do not dispute that the presentation of multiple addresses is relevant to the reasonable suspicion inquiry nor that such a fact, in combination with other factors, can support a finding of reasonable suspicion. The different addresses, however, did not raise questions about Newland's

40

authorization to operate the vehicle and thus were not as probative as those inconsistencies that would lead an officer to prolong a stop in order to verify that the vehicle was not stolen. See J.A. 147 ("There's no indication in the records before me that there was any concern that [Newland] had stolen the car, that he didn't have the car legitimately." (statement of district court)); cf. Williams, 271 F.3d at 1265, 1270 (describing drug couriers' practice of using third-party rental vehicles where defendant's rental agreement was in another's name); United States v. Harris, 928 F.2d 1113, 1114-15 (11th Cir. 1991) (holding that defendant with restricted license stopped in rental car raised question of authorization to drive vehicle); State v. DeMarco, 952 P.2d 1276, 1280 (Kan. 1998) (rejecting existence of reasonable suspicion in case where defendant had rental agreement indicating absent renter).

### 4. Multiple cellular telephones

I agree with the majority that multiple cellular telephones are not suspicious in and of themselves, but may be considered as part of the totality of the circumstances in the reasonable suspicion inquiry. Unlike other communications devices that indicate communication with individuals only within a short range, and thus are particularly prevalent in drug trafficking operations, cellular telephones are commonplace in today's society and thus their presence has only limited probative value. Cf. United States v. Maldonado, 472 F.3d 388, 398 (5th Cir. 2006) ("[T]estimony

indicated that both vehicles had two-way radios typically used by drug traffickers."); <u>Williams</u>, 271 F.3d at 1262 (discussing presence of two-way, short-range radio as indicating that driver intended to stay in contact with someone in close proximity to the car and the use of these devices as a common tactic of drug smuggling teams); <u>Cresswell v. State</u>, 564 So.2d 480, 483 (Fla. 1990) (noting presence of CB radio in defendant's car).

B.

"While law enforcement officers certainly should be permitted to rely on their experience and expertise in detecting criminal behavior, there is a point at which experience becomes only an unparticularized suspicion or hunch." <u>United States v. Lebrun</u>, 261 F.3d 731, 735 (8th Cir. 2001) (Tunheim, J., dissenting) (internal quotation marks omitted). In this case, I believe that the totality of the circumstances did not constitute reasonable suspicion that Newland was engaged in illegal activity. There are multiple factors supporting the existence of reasonable suspicion, but, even when evaluated together, these factors do not rise to the level of suspicion that we require because they do not serve to eliminate the majority of innocent travelers.

Unlike in <u>Brugal</u> and <u>Foreman</u>, none of the factors supporting reasonable suspicion, even when taken together, provide a basis to conclude that Newland was engaged in drug trafficking. For example, in <u>Brugal</u>, while the defendants were traveling on I-95, they also exited the interstate at a "dead exit" to avoid a supposed drug checkpoint further ahead on the highway. 209 F.3d at

42

355. That behavior, in conjunction with inconsistent travel plans and other factors, supported a conclusion of reasonable suspicion. See id. Similarly, in Foreman, travel on a drug corridor, in conjunction with unusual travel plans and a factor directly linked to drug trafficking (the presence of multiple air fresheners hanging from a rearview mirror) created reasonable suspicion. See 369 F.3d at 784-85. In this case, there is no factor—other than Newland's driving on a drug corridor, which I believe is entitled to minimal weight—that links Newland with drug trafficking. Compare Richardson, 385 F.3d at 630-631 (finding lack of reasonable suspicion where defendants exhibited nervousness, gave conflicting travel plans, and one defendant moved to the driver's seat of the car while the officer questioned another defendant), Boyce, 351 F.3d at 1108-10 (finding lack of reasonable suspicion where defendant was driving rental car on known drug corridor, told officer he planned to return car two days late, and videotape of stop did not support police officer's contention that defendant displayed signs of nervousness), Beck, 140 F.3d at 1137 (finding lack of reasonable suspicion where defendant was driving rental car rented by third party, displayed signs of nervousness, was coming from drug source state to drug demand state, had fast food trash on floor of car, and officer did not believe defendant's explanation for trip), and DeMarco, 952 P.2d at 1280, 1285 (finding lack of reasonable suspicion where defendants were traveling in rental vehicle, on drug corridor, and gave inconsistent travel plans and were nervous), with United States v. Bradford, 423 F.3d 1149, 1157-

43

58 (10th Cir. 2005) (finding reasonable suspicion where defendant exhibited "numerous physical manifestations of fright," gave evasive and conflicting answers to basic questions, related travel plans that defied common sense, was driving rental car that contained luggage and fast-food wrappers, and second car exhibiting "chase car" behavior was spotted during stop), Santos, 403 F.3d at 1133-34 (finding reasonable suspicion where defendant driving rental car on drug corridor displayed signs of nervousness, had inconsistent travel plans, could not answer basic questions, and wrongfully denied having criminal record), Williams, 271 F.3d at 1271 (finding reasonable suspicion where defendant exhibited extreme nervousness, had a short-range two-way radio, and was driving a rental car registered in another's name), and Cresswell, 564 So.2d at 481 (finding reasonable suspicion where defendant was driving car registered to someone else, with Maine plates, but New York inspection sticker, on drug corridor, and where defendant exhibited signs of nervousness, the car contained a CB radio, as well as items in the backseat normally found in trunk). Taking Newland's behaviors in conjunction, there is no concrete basis upon which to justify the elevation of those innocent factors into the existence of reasonable suspicion.

In the ordinary case, we give due weight to factual inferences drawn by local law enforcement officers. Ornelas v. United States, 517 U.S. 690, 699 (1996). In this case, however, there was no testimony from Trooper McCarthy that reasonable suspicion was established solely from the factors upon which we must rely on this

44

appeal.  Trooper McCarthy testified that his suspicion was based on Newland's license—a consideration that the district court rejected.  Furthermore, Trooper McCarthy's testimony did not provide sufficient links between the factors supporting reasonable suspicion and the commission of a serious crime by Newland.  For example, though Trooper McCarthy noted in his report that Newland's hands shook when he provided his license and the rental agreement, he did not testify as to whether Newland appeared exceptionally nervous in comparison to other motorists or whether Newland's nervousness dissipated during the course of the stop.  Similarly, Trooper McCarthy did not testify about any link between cellular telephones and drug trafficking or inquire as to the consequences if Newland returned the rental car late.

On appeal, the Government has focused on establishing that Newland's license was obviously fraudulent; it has offered no analysis as to why, accepting the factual findings of the district court, reasonable suspicion existed.  Thus, neither Trooper McCarthy's testimony, nor the Government, provide any cognizable reason why the factors discussed above, innocent in their isolation, become sufficient to support reasonable suspicion when they are taken in their entirety.

In sum, reviewing the facts in the light most favorable to Newland, as we must, I do not believe that reasonable suspicion existed.  The totality of the circumstances did not support the conclusion that Newland was committing a serious crime, given that none of the factors provided a direct link to drug trafficking and

there is no evidence as to why the totality of the circumstances indicated that Newland was committing a serious crime. Because the factors would not exclude a majority of innocent travelers, Trooper McCarthy wrongfully prolonged the traffic stop to allow the canine unit to arrive. I would thus affirm the district court and suppress the evidence resulting from the canine sweep of Newland's vehicle.

V.

With all due respect, the majority undermines factual findings of the district court, engages in extra-record "factfinding" that is not warranted in this instance, and ignores that the totality of the circumstances did not provide a link to serious criminal activity, in order to uphold the canine sweep of Newland's vehicle. Viewing the facts in the light most favorable to Newland and crediting the district court's findings of facts, as well as inferences drawn from those facts, there was no reasonable suspicion that Newland was committing a serious crime. Thus, I believe that the canine sweep was improper under our precedent and would affirm the ruling of the district court. Accordingly, I respectfully dissent.