**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-4354**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

HECTOR JAVIER CARABALLO,

Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News.  Henry Coke Morgan, Jr., Senior District Judge.  (4:08-cr-00035-HCM-TEM-1)

Submitted:  June 1, 2010                    Decided:  June 23, 2010

Before KING and DAVIS, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

Michael S. Nachmanoff, Federal Public Defender, Frances H. Pratt, Larry M. Dash, Assistant Federal Public Defenders, Norfolk, Virginia, for Appellant.  Neil H. MacBride, United States Attorney, Katherine Lee Martin, Assistant United States Attorney, Norfolk, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Hector Javier Caraballo appeals his conviction and sentence on three counts of bank robbery and two counts of attempted bank robbery, in violation of 18 U.S.C. § 2113 (2006); and eight counts of use of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c) (2006). Caraballo contends that the district court erred in denying his motion to suppress evidence that was recovered from his residence because the search warrant affidavit did not establish probable cause that evidence would be located at his home. Because the good faith exception recognized in United States v. Leon, 468 U.S. 897 (1984) applies, we affirm.

I.

On January 14, 2007, Scott Baber, a Special Agent with the Federal Bureau of Investigation (FBI), was contacted by local law enforcement officers in York County and Henrico County, Virginia, for assistance with investigating a bank robber responsible for eight robberies and attempted robberies between November 7, 2006 and December 21, 2007.

In each robbery, the robber would enter the subject bank near closing time, typically on Friday or Saturday, and direct a teller or bank employee at gunpoint to take him behind the teller counter. On several occasions, the robber would

2

simply jump up on the teller counter and demand that the tellers empty their drawers. In total, the robber had stolen more than $100,000.

The robber was described as a white or Hispanic male between 5'6" and 5'8". The robber often donned a fake beard and spoke with a thick Hispanic accent. Witnesses stated that the robber carried a silver revolver and a camouflage bag covered in a rubbery surface. Surveillance photographs revealed the subject wearing a baseball cap, white tennis shoes and blue jeans, and carrying the silver revolver. In these surveillance photos, the robber was clad in either a blue-checkered flannel jacket or blue-hooded sweatshirt.

Witnesses described the robber as escaping in several different vehicles. First, in a robbery on March 5, 2007, witnesses reported seeing the robber exit in a gold-colored four-door sedan with the license plate JZW 4618. Next, during a robbery in September 2007 a witness described the robber as fleeing in a 1986-87 two-door gray Honda Civic. During a bank robbery on November 10, 2007, witnesses described the robber as fleeing in a dark blue Chevrolet Impala. Finally, two witnesses to a robbery on December 21, 2007, described the car as a dark blue sedan.

Several weeks after Agent Baber began his investigation, he was contacted regarding an attempted bank

3

robbery in Hopewell, Virginia. On that occasion, an unknown individual approached the front door of the Bank of McKinney but, because the bank had just closed, the individual was forced to leave. Surveillance video showed that the individual wore clothing that matched that of the robber and left the scene in an older two-door gray Honda or Toyota with what appeared to be temporary window tint.

Despite the number of robberies, the robber left behind no DNA evidence at any scene, although he did leave shoe impressions at three banks. Because of the lack of suspects, the FBI held a joint press conference in early March 2008 with local law enforcement, presenting surveillance photos of the robber and the dates and times of the robberies. A reward of $20,000 was offered for information leading to an arrest.

The night of the press conference, Baber received a call from an informant[*] claiming that she recognized the robber as Hector Javier Caraballo. The informant agreed to a face-to-face interview the next day and explained that Caraballo met the physical description of the robber: he was Puerto Rican and spoke English with a heavy accent. The informant stated that she recognized Caraballo because of the clothing worn in the surveillance photos as well as his posture and build.

---

[*] Although not identified in the search warrant affidavit, the informant was in fact Caraballo's ex-wife.

4

The informant also explained that Caraballo had a history of violence and drug abuse and had not held a job since 2003 or 2004. The informant supplied photographs of Caraballo wearing clothing similar to that of the robber, including a blue-checkered flannel jacket with a gray hood, blue jeans, and white tennis shoes.

Based upon this information, Baber conducted a brief surveillance of Caraballo. On the morning of March 6, Baber photographed a gray two-door 1988 Toyota Corolla in Caraballo's assigned parking space at his apartment complex. Witnesses from two of the robberies were shown pictures of the car and stated that it looked like the one they had seen. In an interview with the registered owner of the Corolla, Baber learned that the owner had sold the car to Caraballo in March 2007.

Later that day, Baber photographed a dark blue, 2000 Chevrolet Impala belonging to a friend of Caraballo. Witnesses from two of the robberies stated that the car looked like the one they had seen.

Buttressed by these witness statements, Baber and local law enforcement began detailed surveillance of Caraballo. While under surveillance, Caraballo followed a set pattern. He would depart his residence in the morning in his Corolla and drive to the rear of a nearby building. While there, he would place window tinting film on his car windows and enter

5

Interstate 64 westbound toward Mechanicsville. On the way, Caraballo would exit the interstate and put on a new license plate. Caraballo would then reenter the interstate and exit at Mechanicsville. While in Mechanicsville, Caraballo would drive back and forth on Route 360, stopping in parking lots adjacent to two different banks but never exiting his car. After several hours, Caraballo would drive back home. During two of the trips, Caraballo used the license plate JZW 4618—the same license plate reported by a witness at one of the robberies.

Based upon this evidence, Agent Baber prepared a delayed notification search warrant for Caraballo's vehicle. The warrant was executed at 1:00 a.m. on March 25, 2008. The search yielded no evidence implicating Caraballo in the robberies, including either the window tinting or the license plates. Later that morning, the FBI arrested Caraballo as he left his residence. Agent Baber then applied for a search warrant for Caraballo's residence based upon the information recounted above. The affidavit was identical to the affidavit filed for the search of the car, with the addition of a single paragraph:

> On March 25, 2008, at approximately 1:00 am, a delayed notification search warrant was executed on the gray Two door Toyota Corolla associated with the listed individual. No items of evidentiary value were located in the vehicle. Specifically, the stolen license plate, and the press on window tint were not located in the vehicle. At 7:00 am Hector Caraballo

was arrested exiting [his residence]. It is your affiant's belief based upon this search and the surveillance of the individual that these items and other evidence, fruits, and instrumentalities of the bank robberies are located in the apartment associated with Hector Caraballo . . .

(J.A. at 41.)

A federal magistrate judge approved the warrant, and the FBI conducted the search later on March 25. In contrast to the search of the Corolla, this search yielded evidence tying Caraballo to the robberies, including a black wig and fake beard, fake nose and costume makeup, baseball hats matching those worn during several robberies, a blue checkered flannel jacket, black gloves, multiple license plates, window tinting film, a camouflage bag that appeared to be stained with bank dye, United States currency stained with red dye, and a .38 caliber silver revolver.

On April 15, 2008, a federal grand jury sitting in the Eastern District of Virginia indicted Caraballo on three counts of bank robbery and two counts of attempted bank robbery, in violation of 18 U.S.C. § 2113, eight counts of use of a firearm during a crime of violence, in violation of 18 U.S.C. §924(c), and one count of being an unlawful user in possession of a firearm, in violation of §922(g)(1)(3).

On July 1, 2008, Caraballo filed a motion to suppress the evidence recovered from his home, which the district court

denied orally on October 20, 2008. In denying the motion, the district court concluded "very clearly" that there was "probable cause to issue the warrant to search the home." The district court further concluded that probable cause existed "when they observed the defendant coming in and out of the home using the cars that have been also identified." Thus, in the district court's view, "the officer could have gotten warrants for the car and the house at the same time if he wanted to." The district court reiterated that there was "certainly" probable cause at the time the warrant was issued for the house, and that there was "no doubt in the Court's mind about that."

A jury later convicted Caraballo on all but the § 922(g) count and, on March 30, 2009, the district court sentenced Caraballo to 2,292 months imprisonment. Caraballo filed a timely notice of appeal.

## II.

On appeal, Caraballo contests only the denial of the motion to suppress, arguing that the search warrant affidavit fails to establish probable cause and that the warrant is so bare bones as to preclude use of the Leon good faith exception. We will use our discretion to "proceed to the good faith exception without first deciding whether the warrant was supported by probable cause." United States v. Legg, 18 F.3d

8

240, 243 (4th Cir. 1994). Where, like here, "there are no facts in dispute, the applicability of the Leon exception . . . is purely a legal conclusion." United States v. DeQuasie, 373 F.3d 509, 520 (4th Cir. 2004).

"Generally, evidence seized in violation of the Fourth Amendment is subject to suppression under the exclusionary rule," United States v. Andrews, 577 F.3d 231, 235 (4th Cir. 2009), the purpose of which is "to deter future unlawful police conduct," United States v. Calandra, 414 U.S. 338, 347 (1974). The deterrence objective, however, "is not achieved through the suppression of evidence obtained by 'an officer acting with objective good faith' within the scope of a search warrant issued by a magistrate." Perez, 393 F.3d at 461 (quoting Leon, 468 U.S. at 920); see United States v. Mowatt, 513 F.3d 395, 404 (4th Cir. 2008) ("[I]t is the magistrate's responsibility to determine whether probable cause exists, and officers cannot be expected to second-guess that determination in close cases."). Thus, the Leon Court created an exception to the exclusionary rule, permitting the use of evidence "obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." Leon, 468 U.S. at 900. Accordingly, "under Leon's good faith exception, evidence obtained pursuant to a search warrant issued by a neutral

9

magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'" Id. (quoting Leon, 468 U.S. at 922).

The Leon Court cautioned that an officer's reliance on a warrant would not qualify as "objectively reasonable," however, in four circumstances: where (1) probable cause is based on statements in an affidavit that are knowingly or recklessly false; (2) the magistrate fails to perform a neutral and detached function and instead merely rubber stamps the warrant; (3) the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant was so facially deficient that the executing officer could not reasonably have assumed it was valid. United States v. Gary, 528 F.3d 324, 329 (4th Cir. 2008) (internal quotation marks omitted) (citing Leon, 468 U.S. at 914-15).

In this case, Caraballo contends that the third circumstance identified by the Leon court is satisfied. We disagree. The warrant affidavit in this case was very detailed, discussing the beginning of the investigation, the in-depth tip from the anonymous informant, and the corroboration of the tip. The affidavit set forth that Caraballo had access to two of the vehicles matching witness descriptions and that his physical description matched that of the robber. The informant likewise

10

provided photographs showing Caraballo in attire matching the robber: the blue-checkered flannel hooded jacket. In addition, the affidavit set forth that, on two occasions, Caraballo was seen putting on a license plate that matched the plate on the getaway car from one of the robberies. The affidavit discussed in detail the surveillance of Caraballo, in which he would drive long distances, change the appearance of his vehicle en route with window tint and new license plates, and perform reconnaissance on a street where two banks were located. Finally, the warrant affidavit specified that no evidence—i.e., the additional license plates or window tint—was recovered from Caraballo's vehicle, suggesting that those materials were likely in his house. And, the affidavit set forth that the home was indeed Caraballo's—the informant provided his home address, which Agent Baber corroborated by witnessing Caraballo enter and leave the residence over the course of the surveillance.

In United States v. Lalor, 996 F.2d 1578, 1582 (4th Cir. 1993) we applied the good faith exception even though the affidavit in question was "devoid of any basis" to infer that evidence would be at the defendant's residence. In contrast, in this case the affidavit sets forth information suggesting that a search of the residence would reveal at least the license plates and window tinting, which were likely instrumentalities of the bank robberies. Moreover, as in Lalor, "two judicial officers

11

have determined that the affidavit provided probable cause to search." Id. at 1583.

This case thus stands in stark contrast to United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996), in which we rejected application of the Leon good faith exception due to the "bare bones nature of the affidavit" and the fact that the "state magistrate could not have acted as other than a rubber stamp." Id. at 121. The affidavit in Wilhelm relied on an "unknown, unavailable informant without significant [police] corroboration," id. at 123, and we explained our concern that "[u]pholding th[e] warrant would ratify police use of an unknown, unproven informant—with little or no corroboration—to justify searching someone's home," id. at 120. In this case, the officers relied on a heavily detailed tip and spent more than one week of detailed surveillance to corroborate the tip as well as witness accounts from the robberies.

Accordingly, because the Leon good faith exception applies in this case, the district court correctly denied the motion to suppress.


III.

For the foregoing reasons, we affirm the district court's judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the

12

materials before the court and argument would not aid the decisional process.

AFFIRMED